**Randy L. OSBORNE, et al.,
petitioners, Appellants,**

v.

**Richard CHAPMAN, Respondent.**

No. C0–96–2216.

Supreme Court of Minnesota.

Jan. 28, 1998.

Todd W. Foss, Stefanson, Plambeck & Foss, Moorhead, for Appellants.

Thomas F. Ascher, Caldecott Daniels Forro Koepke & Ascher, Minneapolis, for Respondents.

## OPINION

TOMLJANOVICH, Justice.

This case presents the question of whether a negligent tenant is impliedly a "co-insured" under an insurance policy held by the landlord which provides coverage for lost rents and, if so, whether such coverage bars an action by the landlord against the tenant for the lost rents. We also must consider whether the negligent tenant is liable for attorney fees incurred by the landlord in pursuing a claim against the insurer.

Appellants Randy and Carolyn Osborne decided to lease their Moorhead home on a trial basis. Respondent Richard Chapman agreed to rent the home from the Osbornes at a rate of $600 per month.[1] The lease specified a term beginning July 15, 1992, and ending June 15, 1993.[2]

Chapman and his family moved into the home in late June 1992 and lived there until November 15, 1992, when the home was heavily damaged by fire. Chapman, who admits that his negligence caused the fire, paid no rent to the Osbornes from December 1992 onward.

Sometime around the signing of the lease, Randy Osborne and Chapman agreed to approach their respective insurance agents to arrange for appropriate coverage, although they apparently did not discuss the specifics or put the agreement in writing. Chapman procured a tenant's policy. Osborne testified that he asked his insurance agent whether his existing homeowner's policy (an "HO–3") would provide adequate coverage if the home were rented out, and the agent assured him that it did. The Osbornes' insurer, MSI, disputes that Osborne informed the agent of his plans to lease the home.

In fact, under MSI's underwriting rules, the homeowner's policy should have been changed to a "DP–3" fire policy once the Osbornes were no longer residing in the home. Had the fire policy been offered to the Osbornes, they would have had to pay an additional premium for lost rent coverage. However, Coverage D of the Osbornes' homeowner's policy ("Loss of Use") guaranteed compensation for "the fair rental value of that part of the 'residence premises' rented to others or held for rental by [the insured,] less any expenses that do not continue while the premises is [sic] not fit to live in."

Immediately after the fire, the Osbornes notified MSI that the house had been damaged and that they had lost some personal property in the fire. MSI, in turn, notified Chapman's insurer of the loss. In February or March 1993, the Osbornes sought payment from MSI for lost rents pursuant to Coverage D of the homeowner's policy; however, MSI denied the claim. MSI based its decision "primarily on * * * the lease," which obligated Chapman to pay rent through the lease term if he were responsible for the damage that made the house uninhabitable. Secondarily, MSI rejected the claim because the home was not a "residence premises" as defined by the policy, since the Osbornes were not living there.[3]

---

1. Chapman actually paid $650 per month, $50 of which was applied toward the cost of utilities.

2. In part, the lease:
   • obligated Osborne to repair the premises if "any part thereof[ ] shall be partially damaged by fire * * * not due to [Chapman's] negligence";
   • required Chapman to surrender the premises at the end of the lease term "in as good state and condition as they were at the commencement of this lease, * * * damages by the elements excepted";
   • obligated Chapman to keep the premises "in good * * * repair"—specifically, to "make all required repairs to the plumbing, range, heating, apparatus, and electric and gas fixtures whenever damage thereto shall have resulted from [his] misuse, waste, or neglect"; and
   • required Osborne to undertake all "[m]ajor maintenance and repair * * * not due to [Chapman's] misuse, waste, or neglect."

3. The Osbornes' policy limits loss of use coverage (Coverage D) and dwelling coverage (Coverage A) to damage to the "residence premises." The policy defines "residence premises" as "[t]he one[-]family dwelling * * * where [the insured]

The Osbornes met with more success on their Coverage A (dwelling) and C (personal property) claims, although progress was slow. According to MSI, it offered to settle the Coverage A claim in late February, but the Osbornes insisted upon resolving the coverage issues as a "package." Over the next four months, the Osbornes and representatives of MSI held meetings and exchanged letters. After MSI and the Osbornes finally reached an understanding regarding the A and C coverages, the major structural work on the home began in late June 1993.

By November 1993, the home was once again fully habitable. Both Randy Osborne and MSI claim adjuster Ralph Matthiesen testified that the repair of the home took one year from the time of the fire not because the damage was so extensive, but because of disputes between and among the insurers and the Osbornes as to the estimates, whether or whose coverage applied to various items of damage, and how particular items should be repaired or replaced. Not surprisingly, each blamed the other for the delay. Once the repairs were complete, the Osbornes put the home on the market, and it sold in early January 1994.

In October 1995, the Osbornes sued Chapman and his wife on breach of contract and negligence theories and the Osbornes' insurance agent for negligent misrepresentation. The Osbornes amended their complaint in March 1996 to include a claim against MSI for failure to settle. Only the claims against Chapman proceeded to trial.[4] After a bench trial, the district court held that Chapman was liable to the Osbornes for loss of use equalling $7200 (twelve months' rent at $600 per month) and for their lost time, attorney fees, and other expenses (totalling $7376.44) incurred in pursuing their claims against MSI, plus interest but less $200, the amount of Chapman's security deposit. The district court also denied Chapman's motion for a new trial or judgment notwithstanding the verdict.

The court of appeals reversed as to both items of damage. *Osborne v. Chapman*, 562 N.W.2d 1, 4 (Minn.App.1997). First, the court determined that Coverage D of the Osbornes' homeowner's policy, the loss of use provision, applied to cover the lost rents. *Id.* at 3–4. The court further held that "in the absence of an express agreement between the landlord and the tenant regarding the provision of insurance coverage, a tenant is a co-insured with the landlord for the purpose of shielding the tenant from liability for insured losses." *Id.* at 3. Because Chapman was the Osbornes' "co-insured," the court concluded, the Osbornes could not sue Chapman for the lost rents. *Id.* at 3–4.

In addition, the court of appeals reversed the award of attorney fees on two grounds. First, the court of appeals held that the third-party litigation rule applies only to cases in which the expenditures result from the commission of an intentional tort. *Id.* at 4. Second, the court held that the attorney fees and other expenditures incurred by the Osbornes were proximately caused not by Chapman's negligence, but by MSI's breach of its insurance contract with the Osbornes. *Id.*

This court granted review, and we now reverse in part.

### I.

■ Holding that a tenant is a "co-insured" under an insurance policy held by the landlord, the court of appeals concluded that the Osbornes could not sue Chapman. *Id.* at 3–4. In reaching this conclusion, the court relied upon its earlier decision in *United Fire & Casualty Co. v. Bruggeman*, 505 N.W.2d 87 (Minn.App.1993), *pet. for rev. denied* (Minn., Oct. 19, 1993).

The *Bruggeman* court held that an insurance company had no right of subrogation against a negligent tenant for payments it made to the landlord to cover damage to the structure because the landlord and tenant were "co-insureds" under the landlord's fire

---

reside[s] and which is shown as the 'residence premises' in the Declarations."

4. Although the Osbornes and MSI informally resolved the Coverage A and C issues in June 1993,

it was not until April 1996 that the Osbornes executed a *Pierringer* release, releasing MSI and the Osbornes' insurance agent from all claims related to the fire.

policy. *Bruggeman,* 505 N.W.2d at 89. The court adopted the position articulated in *Sutton v. Jondahl:*

> [B]oth landlord and tenant have an insurable interest in the rented premises—the former owns the fee and the latter has a possessory interest. Here the landlords * * * purchased the fire insurance * * * to protect such interests in the property against loss from fire. * * * [A]s a matter of sound business practice the premium paid had to be considered in establishing the rent rate on the rental unit. Such premium was chargeable against the rent as an overhead or operating expense. And of course it follows then that the tenant actually paid the premium as part of the monthly rental.
>
> * * * Prospective tenants ordinarily rely upon the owner of the dwelling to provide fire protection for the realty (as distinguished from personal property) absent an express agreement otherwise. * * *
>
> * * * [W]hen fire insurance is provided for a dwelling it protects the insurable interests of all joint owners * * *. The company affording such coverage should not be allowed to shift a fire loss to an occupying tenant even if the latter negligently caused it.

532 P.2d 478, 482 (Okla.Ct.App.1975), *quoted in part in Bruggeman,* 505 N.W.2d at 88–89. The landlords and tenants in *Sutton* and *Bruggeman* had no express agreements regarding who would procure insurance or what type would be procured. *See Brugge-*

*man,* 505 N.W.2d at 89; *Sutton,* 532 P.2d at 482.[5]

The Osbornes urge us to limit *Bruggeman* to the subrogation context or, in the alternative, to instances in which the lessor and lessee have made some agreement regarding insurance coverage. However, we do not deem *Bruggeman* to be apposite to this case.

This court has stated:

> [I]nsurance coverage of the plaintiff has no effect on the liability of a defendant for a tort. This is on the theory that defendant cannot escape liability for his wrong because of insurance bought and paid for by plaintiff. *The insurance was not carried for the benefit of defendant* but for the protection of plaintiff.

*Donohue v. Acme Heating Sheet Metal & Roofing Co.,* 214 Minn. 424, 425–26, 8 N.W.2d 618, 619 (1943) (citations omitted; emphasis added).

The court of appeals' holding in this case cannot be squared with *Donohue* unless we accept as true the supposition that a landlord maintains lost rents coverage for the tenant's protection. Such coverage plainly exists for the benefit of the landlord, not the tenant, for it is the landlord whose income from the rental property is cut off when a casualty renders the premises uninhabitable.

Moreover, we do not believe it can reasonably be said that "tenants ordinarily rely upon the owner of [a] dwelling to provide" such coverage. *Sutton,* 532 P.2d at 482. The *Sutton* court's analysis focused upon the respective real property interests of landlords and tenants. *See id.* No such property interests exist in future rents.[6]

---

**5.** *Sutton's* result represents the majority view. *See, e.g., New Hampshire Ins. Group v. Labombard,* 155 Mich.App. 369, 399 N.W.2d 527, 531 (1986) (holding that tenant must "express[ly] and unequivocal[ly]" agree to be liable for negligently-caused fire damage to leased premises); *GNS Partnership v. Fullmer,* 873 P.2d 1157, 1163 (Utah.Ct.App.1994) (absent agreement to contrary, tenant is co-insured under fire policy). Yet, in view of the principle that one is ordinarily held liable for his or her negligent acts, many courts adopting the *Sutton* approach have required some evidence that the parties to the lease intended that the landlord would seek recovery from ·its insurer, rather than the tenant, in the event of a loss occasioned by the tenant's negligence. *See, e.g., Alaska Ins. Co. v. RCA Alaska*

*Communications, Inc.,* 623 P.2d 1216, 1219–20 (Alaska 1981); *Bannock Bldg. Co. v. Sahlberg,* 126 Idaho 545, 887 P.2d 1052, 1055 (1994); *Dix Mut. Ins. Co. v. LaFramboise,* 149 Ill.2d 314, 173 Ill.Dec. 648, 651, 597 N.E.2d 622, 625 (1992); *Lexington Ins. Co. v. All Regions Chem. Labs, Inc.,* 419 Mass. 712, 647 N.E.2d 399, 400 (1995); *Jos. A. Bank Clothiers, Inc. v. Brodsky,* 950 S.W.2d 297, 303 (Mo.Ct.App.1997). The Osbornes would have us adopt this standard but, as explained *infra,* we need not reach this issue.

**6.** We express no opinion as to whether tenants reasonably rely upon landlords to insure the leased structure against damage by fire, as suggested in *Sutton* and *Bruggeman.*

■ Under certain circumstances, a landlord and tenant may expressly or implicitly agree to allocate the responsibility for maintaining insurance coverage or in some way agree to hold each other harmless for negligent acts. *See, e.g., Dolphine Mfg., Inc. v. Tehaar*, 404 N.W.2d 295, 297 (Minn.App.) (holding that lease clause, in which lessor waived its right of subrogation for damages to the leased premises up to the amount of insurance coverage, effectively operated to hold each party harmless and to preclude overlapping coverage), *pet. for rev. denied* (Minn., June 25, 1987); *cf. Great N. Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 291 Minn. 97, 99–100, 189 N.W.2d 404, 406–07 (1971) (reviewing the various ways in which an insured can defeat an insurer's subrogation rights). Evidence of such an agreement arguably is present in this case.[7] However, the district court did not analyze the effect, if any, of the lease provisions or of Chapman's and the Osbornes' oral agreement to procure appropriate insurance. In this respect, the district court erred, and we remand for additional proceedings consistent with this opinion.

## II.

■ "[T]his court has always been exceedingly cautious when awarding attorney fees as damages." *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 363 (Minn.1998). Litigants ordinarily may not recover attorney fees absent a specific contract or statutory authorization. *See Langeland v. Farmers State Bank of Trimont*, 319 N.W.2d 26, 33 (Minn.1982). However, we have on occasion recognized one more exception to the general rule:

One who through the tort of another has been required to act in the protection of his [or her] interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

*Restatement (Second) of Torts* § 914(2) (1979); *see also, e.g., Prior Lake State Bank v. Groth*, 259 Minn. 495, 500, 108 N.W.2d 619, 622 (1961) (citing first version of the Restatement).

■ In this case, the district court held that Chapman was liable to the Osbornes for their time, incidental expenses, and the attorney fees they expended in pursuing their claims with MSI, because his negligence was the proximate cause of the expenses. The court of appeals reversed on two grounds. *Osborne*, 562 N.W.2d at 4.

First, the court of appeals sought to limit the third-party litigation rule to cases in which the expenditures result from the commission of an intentional tort. *See id.* The court reasoned that because Chapman was merely negligent, it would be "inappropriate" to hold him liable for the Osbornes' attorney fees and other expenses. *Id.* Because we find no support for the court of appeals' reasoning, we are unwilling to establish such a blanket rule.

However, the second basis for the court of appeals' conclusion is far more persuasive. The court held that the attorney fees and other expenditures incurred by the Osbornes were proximately caused by MSI's breach of its insurance contract with the Osbornes, rather than by Chapman's negligence. *Id.*

7. Randy Osborne testified that he and Chapman orally agreed to procure suitable insurance coverage. However, the lease also contains provisions that arguably shift the risk of loss to Chapman for losses caused by his negligence—at least for damage to the property. *See supra* note 2. On the other hand, the oral agreement to procure insurance coverage, while nebulous, and the yield-back clause's exception for damage "by the elements" arguably release Chapman from liability for losses occasioned by a negligently-caused fire. *Compare Safeco Ins. Co. v. Capri*, 101 Nev. 429, 705 P.2d 659, 660 (1985) (holding that yield-back clause excepting "damage by the elements" could not be read to shift risk of loss to tenant for fire caused by tenant's negligence, particularly since lease obligated lessor to maintain fire insurance), *with Van Wormer v. Crane*, 51 Mich. 363, 16 N.W. 686, 687 (1883) (holding that "damage by the elements" exception in yield-back clause covered only those fires not caused by the lessee's negligence); *Acquisto v. Joe R. Hahn Enters., Inc.*, 95 N.M. 193, 619 P.2d 1237, 1239–40 (1980) (construing yield-back clause that excepted damage by fire, inevitable accident, or the elements not to except fire damage resulting from the tenant's negligence), *overruled on other grounds by C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 817 P.2d 238, 242–43 (1991).

This court has stated that "[t]he [third-party litigation] rule appears to be applied generally * * * except where it is established that the prior litigation was either not the proximate result of the tortious conduct of another or was not undertaken in good faith." *Groth*, 259 Minn. at 500, 108 N.W.2d at 623. Proximate cause is a question of fact "except when the facts are undisputed and are reasonably susceptible of but one inference." *Simon v. Carroll*, 241 Minn. 211, 217, 62 N.W.2d 822, 827 (1954).

We hold that a tortfeasor should not be held liable, pursuant to the third-party litigation rule, for attorney fees incurred by an insured in a failure-to-settle action, absent proof that the insurer did not breach its contract. *See Olson v. Rugloski*, 277 N.W.2d 385, 387–88 (Minn.1979) ("When the insurer refuses to pay or unreasonably delays payment of an undisputed amount, it breaches the contract and is liable for the loss that naturally and proximately flows from the breach."); *cf. American Std. Ins. Co. v. Le*, 551 N.W.2d 923, 927 (Minn.1996) (holding that an insured may not recover attorney fees in a declaratory judgment action "unless the insurer has breached the insurance contract in some respect").

In this case, MSI settled with the Osbornes without admitting liability, and although the district court expressly found that MSI had "resisted the [Osbornes'] claims," it did not decide whether MSI's resistance was justified under the terms of the homeowner's policy. As a matter of law, we conclude that Chapman's negligence did not proximately cause the Osbornes to enter into litigation with MSI—MSI's failure to settle did. Accordingly, we affirm.

Reversed and remanded in part and affirmed in part.