882 A.2d 801

Felix RAUSCH, et ux.

v.

ALLSTATE INSURANCE COMPANY.

Harford Mutual Insurance Company

v.

Janice D. Harkins.

Misc. No. 6, Sept. Term, 2004.
No. 128, Sept. Term, 2004.

Court of Appeals of Maryland.

Sept. 8, 2005.

Reconsideration Denied Oct. 12, 2005.

692

Mark Brown (Elliott Petty of Law Offices of H. Barritt Peterson, Jr. & Associates, Towson), on brief, for appellants.

Erick J. Kirker (Cozen O'Connor, Philadelphia, PA), on brief, for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

It is not uncommon for a fire insurance policy to contain a subrogation clause that permits the insurer to recover, from any person (other than the insured) who causes a covered loss under the policy, amounts paid by the insurer by reason of that loss. Under such a clause, the insurer stands in the shoes of the insured and can seek to recover those amounts to the same extent that the insured could have recovered them from the person causing the loss, had there been no insurance.

The question before us in the two cases that we have consolidated for appellate purposes is under what circumstances, if any, the insurer may pursue its contractual right of subrogation against a tenant of the insured who negligently damaged the insured premises and thereby caused the loss. Although, as we shall see, most of the courts that have addressed the issue have ended up holding in the tenant's favor, denying recovery, the theories used to support that result vary.

Part of the difficulty in agreeing on a single theory to support the result arises from the differing circumstances underlying the cases—the wide variety in lease provisions that define the landlord-tenant relationship, whether the leased property is commercial or residential, whether the lease is of a single-unit structure or part of a multi-unit structure. In large measure, the issue presents a clash between what a direct application of basic and well-established legal principles would produce and what the courts have come to regard as either impractical or inequitable to tenants, or at least certain classes of tenants.

## THE CASES BEFORE US

### *Rausch*

In January, 1999, John Dunlop purchased 5037 Netherstone Court, in Columbia, as a piece of rental property. The property was a single-family dwelling. In September, 1999, he appointed American Relo Realty, Inc. to manage the property. The agreement between Dunlop and American Relo required Dunlop to maintain fire insurance for damage that might arise from the occupancy or management of the house. In March, 2000, American Relo leased the property to the Rausches, for a period of six months, at a rental of $1,500/month. Included in the written lease were provisions that:

(1) Prohibited the tenants from doing anything on the property in contravention of any hazard insurance policy in force or which would increase the premium on such a policy;

(2) Required the tenants to indemnify the owner for any liability for injury, death, property damage, or other loss arising within those portions of the property within the exclusive control of the tenants or occasioned by any act or omission of the tenants;

(3) Required the tenants to surrender the property at the end of the lease in the same condition as when received, ordinary wear and tear excepted;

(4) Declared, with respect to the portions of the property within the exclusive control of the tenants, that the owner was not responsible for any loss or damage to goods or chattels placed in the property or for personal injury to the tenants and that it was the responsibility of the tenants to "obtain and pay the costs of any insurance to protect Tenant from loss or damage to Tenant's personal property placed on, in or about the Property, *and to maintain adequate personal liability insurance.*" (Emphasis added);

(5) Declared that, if the property were rendered totally uninhabitable by fire or certain other causes, or if the property were partially damaged and the owner elected not to repair

the damage, the tenancy would immediately terminate and all rent would cease as of the date of the occurrence; and

(6) Made the tenants responsible for "any and all damages to the Property caused by any act of negligence of Tenant" or other residents of the property as well as for the cost of all repairs, replacements, and related services if the need for the same resulted from the negligence or misuse by the tenants.

Although Item (4) above clearly required the Rausches to maintain "adequate personal liability insurance" and insurance to protect *their* property, and Item (1) anticipated that the owner would likely have a fire insurance policy of his own in force, nothing in the lease itself required the owner to maintain such insurance, and there is no indication that the tenants were aware of that requirement in the management agreement. The owner, in fact, purchased a fire insurance policy from Allstate Insurance Company that remained in force during the tenancy.

On April 12, 2000, Ms. Rausch caused a fire in the property by leaving a flammable item on the rear burner of the electric range that had been turned to "high" and then leaving the house. The fire caused nearly $152,000 in damage. Allstate paid $138,000 to Dunlop.[1] The Allstate policy contained a subrogation clause, which provided that (1) if Allstate paid any loss, the **"insured person's** rights to recover from anyone else become **ours** up to the amount **we** have paid," (2) the insured person "must protect these rights and help **us** enforce them," but (3) the insured could waive **"your** rights to recover against another person for loss involving the property covered by this policy" if the waiver was in writing and was given prior to the date of loss. There is no indication that Dunlop directly made such a waiver.

Exercising its rights as subrogee, Allstate sued the Rausches in U.S. District Court to recover the $138,000 it had paid to Dunlop. The complaint alleged both negligence and breach of

---

1. Although the policy provided $170,000 of insurance, no issue is raised here as to the $138,000 that was paid.

contract. The Rausches moved for summary judgment, arguing that the law prohibited subrogation actions by a landlord's insurer against the landlord's tenants on the ground that the tenants were regarded as implied co-insureds. Both sides acknowledged that, although there were cases on the issue around the country, this Court had never addressed it. Because it was an unanswered question in Maryland, the court, invoking the Maryland Uniform Certification of Questions of Law Act (Maryland Code, § 12–601 through 12–613 of the Cts. & Jud. Proc. Article) (CJP) and Maryland Rule 8–305, certified the following two questions:

"(1) Does Maryland law recognize the doctrine of 'implied co-insureds' so that a tenant is an implied co-insured of the landlord?

(2) If so, is Allstate barred from bringing the instant subrogation action against tenants of its insured?"

We shall address those questions as framed by the court, but, because theories other than "implied co-insured" have been used by courts to preclude subrogation actions against tenants, we shall, in our response, take account of those theories as well. The statute does permit this Court to reformulate the certified questions so long as our answer properly disposes of the questions as certified. *See* CJP § 12–604; *also Mardirossian v. Paul Revere Life,* 376 Md. 640, 647 n. 4, 831 A.2d 60, 64 n. 4 (2003) (citing *Piselli v. 75th Street Medical,* 371 Md. 188, 202 n. 4, 808 A.2d 508, 516 n. 4 (2002)).

### *Harkins*

In May, 1999, Janice Harkins entered into a one-year lease for Apartment 28 in the Oak Court Apartments, a multi-unit apartment development. The lease, signed on behalf of the owner by its leasing agent, United Homes, Inc., ran from June 1, 1999 through May 31, 2000. Included in the written lease were provisions that:

(1) Made available a storage space for Ms. Harkins but, in that provision, stated:

"Resident expressly agrees that landlord shall not be liable for any loss, damage or injury to property. Tenant shall have insurance coverage for this storage area *as well as Renter's Insurance for the apartment.* Landlord is not responsible for such loss which may be incurred." (Emphasis added);

(2) Required the tenant to reimburse the landlord for "any loss, damage or actual cost of repairs or service caused in the apartment or apartment complex by improper use or negligence of tenant or tenant's guests or occupants"; and

(3) Required the tenant, when moving out, to "surrender the apartment in the same condition as when received, reasonable wear expected. Reasonable wear means occurring without negligence, carelessness, accident, or abuse."

Other than the reference in Item (1) to renter's insurance, which Ms. Harkins obtained, the lease was silent with respect to insurance. In fact, the owner obtained a fire insurance policy from Harford Mutual Insurance Company that was in effect during Ms. Harkins's tenancy. The policy contained a subrogation clause, stating that, "[i]f any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment" and that the payee "must do everything necessary to secure our rights and must do nothing after loss to impair them." The clause permitted the insured to waive its rights against another party in writing (1) prior to a loss, or (2) after a loss if the party is a tenant. The owner never directly waived its rights against Ms. Harkins.

On March 29, 2000, Ms. Harkins lit one or more scented candles on a nightstand in her bedroom and then left the room to answer the telephone. While on the telephone, the smoke alarm went off, but Ms. Harkins thought it had malfunctioned. When she smelled smoke, Ms. Harkins investigated and discovered that her bedspread was on fire. After an unsuccessful attempt to extinguish the fire, she left the apartment. The fire and smoke caused extensive damage to the second floor of

the apartment building. Harford paid over $83,000 to repair the damage and then, exercising its rights as subrogee, sued Ms. Harkins in the Circuit Court for Harford County to recover the amount it had paid.

Harkins moved for summary judgment on the grounds that (1) as a matter of law, she was not negligent in causing the fire, and (2) the subrogation clause relied on by Harford was unenforceable because (i) she was an implied co-insured under the policy, (ii) the clause was against public policy, and (iii) it would be inequitable to enforce the clause against her. The Circuit Court was unable to conclude that there was an absence of negligence, as a matter of law, but, relying on the holding and pronouncements in *Sutton v. Jondahl*, 532 P.2d 478 (Okla.Ct.App.1975) and other cases adopting those pronouncements, found that Harkins was an implied co-insured under the Harford policy and that, as a result, the subrogation clause could not be enforced against her. On that ground, it entered summary judgment for Ms. Harkins. Harford appealed, and we granted *certiorari* on our own initiative prior to proceedings in the Court of Special Appeals and consolidated the case with *Rausch* for argument and decision.

## DISCUSSION

### Introduction

■ These cases involve the coalescence of at least five independent principles of law, each fairly well-established. The first is simply an application of general negligence principles to the landlord-tenant relationship. It has long been recognized, although there are a dearth of cases in Maryland, that, in the absence of any valid contractual provision to the contrary, a tenant is liable in tort to the landlord if and to the extent that the tenant negligently damages the landlord's property. *See Pearson v. Wiltrout*, 17 Md.App. 497, 302 A.2d 678 (1973); *Liability of Tenant for Damage to the Leased Property Due to His Acts or Neglect*, 10 A.L.R.2d 1012, 1014

(1950);[2] 1 Friedman on Leases § 9.9 (4th ed.1997). The Legislature has recognized and given effect to that principle. *See,* for example, Maryland Code, § 8–203 of the Real Property Article, permitting residential landlords to demand security deposits from tenants to protect, among other things, against damage to the leased premises and, upon termination of the lease, to retain amounts for damage to the leased premises in excess of ordinary wear and tear.

■ A second principle, which is a corollary to the first, is that, although State law prohibits clauses in a lease that purport to exonerate a landlord from liability for injury or loss caused by the landlord's negligence (*see* Maryland Code, § 8–105 of the Real Property Article), there is no flat prohibition against a clause exonerating a tenant from liability for loss caused by the tenant's negligence or a provision waiving a landlord's right to sue a tenant for damage negligently caused by the tenant. If a lease contains such a provision, expressly or impliedly, and is otherwise valid, that provision may effectively negate any common law tort liability on the part of the tenant.

■ The third principle is an application of basic contract law to the landlord-tenant relationship. Just as a lease may negate a tenant's common law tort liability, it may, independently of tort liability, contractually impose liability on the tenant for damage to the leased premises resulting from the tenant's negligent act or omission, either by a specific lease provision to that effect or by a covenant on the part of the tenant to return the property, save for ordinary wear and tear, in the same condition as the tenant received it.[3]

---

**2.** "It may be stated as a basic proposition in the law of landlord and tenant that it is the duty of the tenant to exercise ordinary care, in the use of the leased premises or property, not to cause any material and permanent injury thereto over and above the ordinary wear and tear, and that he is liable to the landlord in damages for any such injury unnecessarily resulting from his wrongful acts or his failure to exercise such care." *Id.*

**3.** In that regard, *see* Maryland Code, § 8–113 of the Real Property Article, which provides that a covenant by the tenant to restore,

■ The fourth and fifth principles arise from the law of subrogation and its application to subrogation clauses found in insurance policies. It has long been recognized, as a legal principle, that an insurer may not recover from its insured, or a co-insured, as subrogee. *See Wager v. Providence Ins. Co.*, 150 U.S. 99, 110, 14 S.Ct. 55, 58, 37 L.Ed. 1013, 1018 (1893). In *Aviation Ins. Co. v. Barclay*, 237 Md. 318, 327, 206 A.2d 119, 123–24 (1965), we noted, albeit in *dicta*, that "[t]he authorities are in complete accord, and it is conceded in the instant case, that the insurer cannot recover, as subrogee, against its insured," and that is clearly the case. *See also* R. Keeton and A. Widiss, INSURANCE LAW, 341 (1988). Indeed, any other construction would be absurd—because, as subrogee, the insurer stands in the shoes of the insured, it would essentially involve the insured suing himself to recover damages he sustained by his own conduct. Those courts which find a tenant to be an implied co-insured of the landlord use that principle to deny recovery.

■ Apart from that legal limitation, equitable principles apply to subrogation. In *Bachmann v. Glazer*, 316 Md. 405, 412, 559 A.2d 365, 368 (1989), citing a number of earlier cases, we observed that subrogation is founded on the equitable powers of the court and is intended "to provide relief against loss and damage to a meritorious creditor who has paid the debt of another." It is, we said, "a legal fiction whereby an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of this third person" who "succeeds to the rights of the creditor in relation to the debt." *Id.* The rationale for the doctrine is "to prevent the party primarily liable on the debt from being unjustly enriched when someone pays his debt." [4] *Id.*

---

surrender, or yield the leased premises in good repair does not bind the tenant to erect or pay for any building destroyed by fire or otherwise "without negligence or fault on the tenant's part." The implication from that statute is that such a clause, standing alone and in the absence of any inconsistent provision, *will* obligate the tenant to restore premises damaged as a result of the tenant's negligence or fault.

**4.** Couch provides a more comprehensive basis for subrogation, looking at it from the perspective of the insured, the insurer, and the tortfeasor.

■ We noted in *Bachmann* that there were three categories of subrogation—legal, which arises by operation of law when a third party, who pays another's debt to protect his/her own interests, is deemed entitled to reimbursement; conventional, which is provided for by contract; and statutory, which, of course, arises from an act of the Legislature. The basis of conventional subrogation—the kind we have here—is "an agreement, express or implied, between a debtor and a third party or between a creditor and a third party that, upon payment of the debt, the third party will be entitled to all the rights and securities of that debtor or that creditor." *Id.* at 413–14, 559 A.2d at 369. We confirmed in *Bachmann*, however, that, though founded on contract, recovery on a theory of conventional subrogation is nonetheless subject to principles of equity and that "[a] conventional subrogee is not necessarily entitled to subrogation as a matter of legal right; the relative equities of the parties are still to be balanced." *Id.* at 416, 559 A.2d at 370.

The theory espoused by the insurance companies in these cases is that the tenants, through their own negligent acts or omissions, caused substantial damage to their landlord's property and that, as a result, were liable to the landlords, in both tort and contract, for the damage they caused. Had there

---

From the insured's perspective, subrogation "has the objective of preventing the insured from recovering twice for one harm, as would be the case if he or she could recover from both the insurer and from a third person who caused the harm." 16 COUCH ON INSURANCE 3d, § 222:8 (2000). In essence, this is a contractual repudiation of the "collateral source rule" which otherwise would apply in Maryland. *See Haischer v. CSX*, 381 Md. 119, 848 A.2d 620 (2004). From the tortfeasor's perspective, Couch iterates the point made in *Bachmann*, that the tortfeasor should not receive the windfall of being absolved from liability because the insured procured, and paid for, insurance. 16 COUCH, *supra*. Finally, as to the insurer, Couch makes two points. First, it is equitable, he says, that the insurer should be reimbursed for its payment to the insured, to avoid either of the two prospects noted above—that the insured recover twice for the single loss or that the tortfeasor be relieved of any responsibility for his/her tortious conduct. Second, he notes that subrogation is in a sense a salvage operation—that insurers are usually entitled, by way of salvage, to the benefit of anything that may be received from the property insured or damages paid by third persons for the same loss. *Id.*

been no insurance, the landlords would have been entitled to sue the tenants to recover for the loss. Pursuant to their own contractual obligation under the fire insurance policies, the insurers paid at least part of the debt owed by the tenants and, under the conventional subrogation clauses in those policies, they succeeded to the rights of the landlords—their insureds—and were therefore entitled to be reimbursed by the tenants, who were the principal debtors.

Holding aside the lingering question of Harkins's negligence, which was never resolved, the defense in these cases invokes predominantly the assertion that the tenants are, in effect, co-insureds with their landlords under the landlords' policies and, as such, may not be sued under the subrogation clauses. Harkins adds the equitable defense—that it would be inequitable to permit the insurers to proceed against the tenants under their subrogation clauses. Thus, although the tenants' ultimate responsibility arises from principles of tort and contract liability, the decisive issue before us is one of subrogation law. Are the tenants to be regarded, either as a matter of law or a matter of fact, as co-insureds under the landlords' insurance policies and, if not, is there some other basis, including any paramount equity, favorable to them that precludes the enforcement of an otherwise valid subrogation clause?

### *The Legal Landscape*

Although the prospect of subrogation claims against tenants of the insured has long existed, the actual emergence of such actions has been traced by at least one commentator, Milton Friedman, to a 1950 case that inferentially involved but did not turn on a subrogation claim—*General Mills v. Goldman,* 184 F.2d 359 (8th Cir.1950), *cert. denied,* 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683 (1951). *See* Friedman, FRIEDMAN ON LEASES § 9.9 (4th ed.1997). In that case, Goldman purchased investment property for $110,000 and promptly leased it to General Mills for a ten-year period at an annual rental of $15,000.[5]

---

**5.** The land was actually owned by several persons, but Goldman received an assignment from the other owners and, for purposes of the case, was treated as the owner.

Two years into the lease, the processing plant situated on the land was destroyed by a fire that Goldman contended was caused by the tenant's negligence. Goldman had obtained a fire insurance policy that provided $100,000 of coverage for loss to the building and $15,000 for loss of rental, and the company, in furtherance of that obligation, paid Goldman nearly $111,000. Notwithstanding that payment, which exceeded the cost of the property, Goldman sued to recover $342,000 from General Mills, for additional costs and loss of rental.[6] The insurer intervened, as subrogee, to recover the amount it had paid Goldman.

The case, governed by Minnesota law, turned on a general provision in the lease that exonerated the tenant from liability for "loss by fire." *Goldman, supra,* 184 F.2d at 366. Goldman's position, and apparently that of the insurer, was that the exoneration did not apply to a fire caused by the tenant's negligence. General Mills argued that the exoneration did so apply because it was contemplated by the parties that *any* reimbursement for fire loss, however caused, would come from the landlord's fire insurance.

Reversing a judgment for Goldman and the insurer, a majority of the appellate panel concluded that there was no public policy in Minnesota that would preclude the parties from resorting solely to fire insurance in the event of a fire, whether or not occasioned by the tenant's negligence, and it construed the lease as being to that effect. In the court's view, the exoneration for "loss by fire" anticipated that the loss would be covered by insurance regardless of any negligence and, if the landlord wished to limit that exoneration, it could have done so in the lease. In light of all of the other detailed provisions regarding tenant liability and the court's supposition that, because the property was purchased as an investment the premiums for insurance coverage would come from the rent paid by General Mills, the panel majority simply

6. The majority opinion in the case omits many of these underlying facts, which have to be gleaned from the dissenting opinion of Judge Sanborn. *Goldman, supra,* 184 F.2d at 367–74.

refused to read into the general exoneration the unwritten exception sought by Goldman.

The importance of the case, according to Friedman, FRIEDMAN ON LEASES § 9.9, *supra,* lies in the fact that the court, in ultimately ruling for the tenant, was forced to rely on the exoneration clause in the lease, thereby acknowledging "that in its absence the tenant would have been liable to the landlord's insurer under the doctrine of subrogation." *Id.* at 572–73. Whether that nuance in fact encouraged insurers to seek to enforce subrogation clauses against tenants is unclear. *Goldman* has been frequently cited, but mostly for the proposition that the parties, through express or implied exoneration clauses in the lease, can effectively shift the burden of liability from the tenant to the landlord's insurance company.[7] Indeed, it is that concept—the second principle noted above—that has taken root.

The generally accepted progenitor of the "no-subrogation" rule is *Sutton, supra,* 532 P.2d 478.[8] In *Sutton,* the 10–year–

---

7. Citing cases from Georgia, Kansas, Louisiana, Michigan, Missouri, North Carolina, Texas, West Virginia, and the U.S. Court of Appeals for the Sixth Circuit, Friedman notes that *"Goldman* has been followed by a series of cases in which insurance companies recovered against tenants on the basis of subrogation." Friedman, FRIEDMAN ON LEASES § 9.9 at 573. Although some of the post-*Goldman* cases cited by Friedman do, indeed, permit subrogated claims to proceed against tenants, none of them relied on *Goldman* for that result.

8. There was, in fact, an earlier case upon which the *Sutton* court relied, at least in part. In *New Hampshire Ins. Co. v. Ballard Wade, Inc.,* 17 Utah 2d 86, 404 P.2d 674 (1965), a fire of undetermined origin damaged leased premises. Although the lease required the tenant to return the property in as good condition as when received, the landlord and his insurer, without consulting the tenant, repaired the damage themselves. The landlord's fire insurer, which had paid at least part of the loss, sued the tenant for indemnity based on the tenant's breach of contract. The trial court ruled for the insurer, apparently on the theory that the tenant was strictly liable to the lessor for the damage and therefore must be so to the insurer.

The appellate court reversed, holding that, although there might be strict liability to the lessor, there was none to the insurer. There was no mention of any subrogation clause in the policy, and, indeed, the word "subrogation" appears nowhere in the opinion. The court treated the action as simply one of indemnity based on a clause in the lease

old son of the tenant caused a fire in the leased premises while playing with his chemistry set. The landlord's insurer, which paid the loss, sued the father and the son, alleging negligence on both their parts, and, after a full trial, won a verdict against the father, but not the son. The appellate court reversed, predominantly upon finding error in jury instructions that plainly cast the burden on the defendants to prove that they were *not* negligent. That alone required a new trial. The court then turned to the insurer's role, which is the relevant part of the opinion for our purposes.

Because the insurer paid the entire amount of the loss, the trial court found that the landlords were no longer parties in interest, and it required that the insurer be substituted for the landlords as the plaintiff. That ruling does not appear to have been disturbed on appeal, thus leaving the case as one between the insurer and the tenant. The court treated the insurer as a subrogee, although it is not clear whether there was a subrogation clause in the policy, and, with a rhetorical flourish reminiscent more of lyrical poetry than stodgy equity jurisprudence, characterized subrogation as "begotten of a union between equity and her beloved—the natural justice of placing the burden of bearing a loss where it *ought to be.*" *Id.* at 481–82. In that regard, and without citing any authority whatever, the court concluded:

requiring the tenant to return the property in as good a condition as when received, but noted that (1) the insurer was neither a party to, nor a third party beneficiary of, the lease, and (2) because the landlord and the insurer, without consulting the tenant, stepped in and repaired the damage themselves, the tenant was never afforded an opportunity to make the repairs. Apparently, but tacitly at best, viewing the insurer's claim as one of legal, rather than contractual/conventional subrogation, the court admonished that,

> "when the assignee here has accepted a consideration to cover a risk, it hardly lies in its mouth to claim indemnity from one who has made a written guaranty against loss, to which agreement the insurance company was neither a party nor expressly or impliedly a beneficiary, *and the lessee was not shown to be negligent ...*" (Emphasis added).

*Id.* at 675.

"Under the facts and circumstances in this record the subrogation should not be available to the insurance carrier because the law considers the tenant as a co-insured of the landlord absent an express agreement between them to the contrary, comparable to the permissive-user feature of automobile insurance."

*Id.* at 482.

That principle, the court added, was derived "from a recognition of a relational reality, namely, that both landlord and tenant have an insurable interest in the rented premises—the former owns the fee and the latter has a possessory interest." *Id.* at 482. Here, the court said, the landlords purchased fire insurance "to protect *such interests* in the property against loss from fire" and that "the premium paid had to be considered in establishing the rent rate on the rental unit." *Id.* From that, the court concluded that "the tenant actually paid the premium as part of the monthly rental." *Id.* Based on its own *ex cathedra* assumption of the "realities of urban apartment and single-family dwelling renting," the court determined that tenants "rely upon the owner of the dwelling to provide fire protection for the realty (as distinguished from personal property) absent an express agreement otherwise" and that "[b]asic equity and fundamental justice upon which the equitable doctrine of subrogation is established requires that when fire insurance is provided for a dwelling it protects the insurable interests of all joint owners including the possessory interests of a tenant absent an agreement to the contrary." *Id.* at 482. Upon that determination, the court held that "[t]he company affording such coverage should not be allowed to shift a fire loss to an occupying tenant even if the latter negligently caused it." *Id.* (citing *New Hampshire Ins. Co., supra,* 404 P.2d at 674).

As a final comment, the court observed that the failure of the pleadings and the evidence to show that the insurer even *had* a right of subrogation against the tenant furnished another reason why it was error to instruct the jury to return a verdict for the insurer unless the tenant proved that he was

not negligent. With that, the court remanded the case for a new trial.[9]

Though the ultimate conclusion in *Sutton* was based, to some extent, on the court's perception of the tenant's expectations under the lease, the case has been treated as establishing at least a presumption, if not a *per se* rule, that, absent an express agreement in the lease to the contrary, landlord and tenant are co-insureds under a landlord's fire insurance policy, and, as a result, the insurer has no right of subrogation against the tenant to recover amounts paid on the policy by reason of a fire loss, even if caused by the negligence of the tenant. Several courts have followed the rigid approach taken by the Oklahoma intermediate appellate court, although not necessarily the rationale for that approach. *See DiLullo v. Joseph*, 259 Conn. 847, 792 A.2d 819 (2002); *Lexington Ins. Co. v. Raboin*, 712 A.2d 1011 (Del.Super.1998); *North River Ins. Co. v. Snyder*, 804 A.2d 399 (Me.2002); *Peterson v. Silva*, 428 Mass. 751, 704 N.E.2d 1163 (1999); *United Fire & Cas. Co. v. Bruggeman*, 505 N.W.2d 87 (Minn.App.1993); *Tri–Par Investments, L.L.C. v. Sousa*, 268 Neb. 119, 680 N.W.2d 190 (2004); *Safeco Ins. Co. v. Capri*, 101 Nev. 429, 705 P.2d 659 (1985); *Community Credit Union of New Rockford, N.D. v. Homelvig*, 487 N.W.2d 602 (N.D.1992); *GNS Partnership v. Fullmer*, 873 P.2d 1157 (Utah App.1994); *Cascade Trailer Court v. Beeson*, 50 Wash.App. 678, 749 P.2d 761 (1988). The Oklahoma Supreme Court has acknowledged *Sutton* but has not yet blessed it. *See Travelers Insurance Companies v. Dickey*, 799 P.2d 625 (Okla.1990) (distinguishing *Sutton* and holding that a roofing contractor was not a co-insured under the owner's policy, notwithstanding a provision in the roofing contract requiring the owner to maintain property insurance).

---

**9.** A curious, and unexplained, thing is what the court expected to be retried. If the reversal was based solely on the erroneous instructions that shifted the burden of proof, a retrial would be in order, but if the court was also holding, as it seemed to be, that, on the record established in this fully-tried case, the insurer—the only plaintiff left in the case—had no cause of action because it had no right of subrogation against the tenant, there would be nothing to retry.

Not all of those courts have rested their decision entirely on the assumptions made in *Sutton*, however, but have offered additional "law and economics" justifications for the rule. In *DiLullo, supra,* 792 A.2d at 822, for example, the Connecticut court noted the substantial criticism of *Sutton's* view of the tenant as a co-insured and agreed both that (1) "under traditional rules of insurance law, a tenant is not a coinsured on his landlord's fire insurance policy simply because he has an insurable interest in the premises and pays rent," and (2) under "traditional rules of contract law, whether subrogation would or would not apply ordinarily would depend, in large part, on a case-by-case analysis of the language of the insurance policies and leases involved." It concluded, however, based on "matters of policy and fairness," that "the *Sutton* result is sound as a matter of subrogation law and policy." *Id.* The court expressed concern, especially when dealing with a multi-unit structure, that allocating responsibility to the tenant to maintain sufficient insurance in anticipation of a subrogation claim would be "untenable" in that it might require tenants to insure for an amount necessary to cover the replacement cost, not just of their unit, but of the entire building. That would produce layers of insurance to protect against the same loss, which the court concluded would be economic waste.[10]

Several of the *Sutton* followers have echoed that concern. The *GNS* court concluded that, at least for residential tenants, the *Sutton* presumption was "the most efficient way to allocate insurance costs." *GNS, supra,* 873 P.2d at 1164. *See also*

---

10. It is interesting to note that, in *Middlesex Mut. Assur. Co. v. Vaszil,* 89 Conn.App. 482, 873 A.2d 1030, 1032 (2005), the intermediate appellate court of Connecticut regarded the rule enunciated in *DiLullo* as a "default rule," and held that subrogation would be allowed if the lease requires the tenant to repair any damage he causes. The court observed that the goal of equitable subrogation is to avoid injustice by requiring payment from the party that caused the harm and that "when financial injustice and some potential for economic waste collide, subrogation jurisprudence places the weight of authority on preventing injustice." *Id.* at 1035. Whether the Connecticut Supreme Court will acquiesce in that view of its *DiLullo* decision remains to be seen.

*North River, Ins. Co., supra*, 804 A.2d 399. Other *Sutton* followers have accepted more the notions that (1) because the cost of insurance is presumably included in the rent charged by the landlord, the tenant has actually paid the premiums on the policy and ought to be regarded as a co-insured for that reason, or (2) insurance companies "expect to pay their insureds for negligently caused fires and adjust their rates accordingly." *See Safeco Ins. Co., supra*, 705 P.2d at 661; *also Tate v. Trialco Scrap, Inc.* 745 F.Supp. 458 (M.D.Tenn. 1989); *Community Credit, supra*, 487 N.W.2d 602; *New Hampshire Ins. Group v. Labombard*, 155 Mich.App. 369, 399 N.W.2d 527 (1986). There is clearly not a single accepted theory, even among the *Sutton* followers, and there is certainly no general consensus that landlords and tenants are co-insureds. Notwithstanding language in some opinions to the effect that *Sutton* represents a majority view, that is clearly not the case. Only a handful of courts have actually embraced the *Sutton* rationale.

At the other end of the spectrum, a number of courts have taken an opposite approach and permitted an insurer to bring a subrogation claim against the tenant absent an express or implied agreement precluding such a claim. Some of those courts have looked, in making that determination, to whether there was an agreement by the landlord either to maintain insurance for the benefit of the tenant or to look only to its own insurance for compensation. *See Page v. Scott*, 263 Ark. 684, 567 S.W.2d 101 (1978); *Neubauer v. Hostetter*, 485 N.W.2d 87 (Iowa 1992); *Britton v. Wooten*, 817 S.W.2d 443 (Ky.1991); *Osborne v. Chapman*, 574 N.W.2d 64 (Minn.1998); *Zoppi v. Traurig*, 251 N.J.Super. 283, 598 A.2d 19 (1990); *Galante v. Hathaway Bakeries, Inc.*, 6 A.D.2d 142, 176 N.Y.S.2d 87 (1958); *Winkler v. Appalachian Amusement Co.*, 238 N.C. 589, 79 S.E.2d 185 (1953); *Regent Ins. Co. v. Economy Preferred Ins. Co.*, 749 F.Supp. 191 (C.D.Ill.1990); *56 Associates ex rel. Paolino v. Frieband*, 89 F.Supp.2d 189 (D.R.I.2000). Those courts have applied basic contract and tort law and have roundly criticized the assumptions and fictions employed by the *Sutton* group.

In *Page,* the Arkansas court noted that, had there been no insurance, the landlord could clearly have recovered for damage negligently caused by the tenant and, applying its version of the collateral source rule, held that the existence of fire insurance would not have precluded such a recovery. The court agreed that the insurer would have no subrogation "if the parties had agreed as a part of the transaction that insurance would be provided for the mutual protection of the parties," *id.* at 103, or if such an agreement could be implied, but in the absence of any such express or implied agreement, there was no reason not to allow a subrogated claim. The *Page* court expressly rejected the fiction that the tenant somehow paid the insurance premium, noting that there was no evidence that the tenant paid any greater rent because of the insurance than he would otherwise. Such a fiction, it said, "ignores the fact that more often than not the market, i.e., supply and demand, is the controlling factor in fixing and negotiating rents." *Id.* at 104.

Although Appleman acknowledges *Sutton* as a modern trend, he criticizes the holding and the trend:

"*Sutton,* the leading modern case denying subrogation of lessees, cites no cases for the proposition that the lessee is a co-insured of the lessor, comparable to a permissive user under an auto insurance policy. Contrary to the court's statement, the fact both parties had insurable interests does not make them co-insureds. The insurer has a right to choose whom it will insure and did not choose to insure the lessees, and under this holding the lessee could have sued the insurer for loss due to damage to the realty, e.g., loss of use if policy provides such coverage."

6A, J.A. Appleman, Insurance Law and Practice, § 4055, at 78 (2005).

In *Neubauer v. Hostetter, supra,* 485 N.W.2d at 90, the Iowa court agreed with that criticism and refused to accept that "fire insurance on an entire dwelling includes the interest of both landlord and tenant as a matter of law." That argument, it said, "disregards the fact that these are separate

estates capable of being separately valued and separately insured." *Id.* The *56 Associates* court, applying Rhode Island law, noted that an insurance policy is a contract between the insurer and the insured, and it is not for the courts to add additional insureds to the policy—to "rewrite a policy or read provisions into it in order to achieve what the court subjectively may believe to be a desirable result." *56 Associates, supra,* 89 F.Supp.2d at 193. Echoing the point made by Appleman, the court pointed out that the mere fact that a tenant may have an insurable interest or that part of his rent payment may be used to pay premiums on the policy does not make him a co-insured. If the tenant *were* a co-insured, he/she would be entitled to some part of the proceeds, which even the *Sutton* followers have not suggested.

■ Most of the courts that have dealt with this issue, including some that have been characterized as being in one or the other of the two camps noted above, have taken a middle approach. They have adopted the basic underpinning of *Sutton* (and *Goldman* ) that a tenant's liability in a subrogation action should be determined by the reasonable expectations of the parties to the lease but have rejected a *per se* or presumptive co-insured status and looked to the lease as a whole to determine those expectations.[11] That point was well-

---

11. See *General Acc. Fire & Life Assur. Corp. v. Traders Furniture Co.,* 1 Ariz.App. 203, 401 P.2d 157 (1965); *Page, supra,* 263 Ark. 684, 567 S.W.2d 101; *Fire Ins. Exchange v. Hammond,* 83 Cal.App.4th 313, 99 Cal.Rptr.2d 596 (2000); *U.S. Fidelity & Guar. v. Let's Frame It,* 759 P.2d 819 (Colo.Ct.App.1988); *Middlesex Mut. Assur. Co., supra,* 89 Conn.App. 482, 873 A.2d 1030; *Pettus v. APC, Inc.,* 162 Ga.App. 804, 293 S.E.2d 65 (1982); *Bannock Bldg. Co. v. Sahlberg,* 126 Idaho 545, 887 P.2d 1052 (1994); *Towne Realty, Inc. v. Shaffer,* 331 Ill.App.3d 531, 265 Ill.Dec. 685, 773 N.E.2d 47 (2002), *but compare Dix Mut. Ins. Co. v. LaFramboise,* 149 Ill.2d 314, 173 Ill.Dec. 648, 597 N.E.2d 622 (1992); *Sears, Roebuck & Co. v. Poling,* 248 Iowa 582, 81 N.W.2d 462 (Iowa 1957); *New Hampshire Ins. Co. v. Fox Midwest Theatres, Inc.,* 203 Kan. 720, 457 P.2d 133 (1969); *Britton, supra,* 817 S.W.2d 443; *Seaco Ins. Co. v. Barbosa,* 435 Mass. 772, 761 N.E.2d 946, 950 (2002) (rejecting *Sutton* with respect to commercial leases); *Fry v. Jordan Auto Co.,* 224 Miss. 445, 80 So.2d 53 (1955); *Rock Springs Realty, Inc. v. Waid,* 392 S.W.2d 270 (Mo.1965); *Phoenix Ins. Co. v. Stamell,* 21 A.D.3d 118, 796 N.Y.S.2d 772 (2005); *U.S. Fire Ins. Co. v. Phil–Mar Corp.,* 166 Ohio St.

documented in *Union Mut. Fire Ins. Co. v. Joerg,* 175 Vt. 196, 824 A.2d 586 (2003). There, the court observed:

> "The majority of courts, however, have avoided per se rules and taken a more flexible case-by-case approach, holding that a tenant's liability to the landlord's insurer for negligence causing a fire depends on the intent and reasonable expectations of the parties to the lease as ascertained from the lease as a whole. [extensive citations omitted]. Of the courts following this approach, most that have denied subrogation have done so because of the existence of specific provisions in the lease, such as a provision obligating the landlord to purchase fire insurance on the premises or a clause excepting fire damage from the tenant's responsibility to maintain or return the property in a good state and condition."

*Id.* at 589–90. The holding of the Vermont court was that "where the lease requires the landlord to carry fire insurance on the leased premises, such insurance is for the mutual benefit of landlord and tenant, and, as such, the tenant is deemed a coinsured under the landlord's insurance policy and is protected against subrogation claims by the landlord's insurer." *Id.* at 591.

### Conclusion

We believe that this middle approach, of looking to the reasonable expectations of the parties to the lease, as determined from the lease itself and any other admissible evidence, is the appropriate one to follow. It avoids the court making assumptions and adopting fictions that are largely conjectural, if not patently illogical, and instead applies basic contract

85, 139 N.E.2d 330 (1956); *Cincinnati Ins., Co. v. Control Serv. Technology, Inc.,* 111 Ohio App.3d 801, 677 N.E.2d 388 (1996); *Koch v. Spann,* 193 Or.App. 608, 92 P.3d 146 (2004), *review denied,* 337 Or. 547, 100 P.3d 217 (2004); *Hardware Mut. Ins. Co. of Minn. v. C.A. Snyder, Inc.,* 137 F.Supp. 812 (W.D.Pa.1956), *aff'd,* 242 F.2d 64 (3rd Cir.1957); *Wichita City Lines, Inc. v. Puckett,* 156 Tex. 456, 295 S.W.2d 894 (1956); *Monterey Corp. v. Hart,* 216 Va. 843, 224 S.E.2d 142 (1976); *Allstate Ins. Co. v. Fritz,* 2005 WL 1533103 (W.D.Va.2005).

principles and gives proper credence to the equitable underpinning of the whole doctrine of subrogation.[12]

The notion that, barring some express provision to the contrary, landlords and tenants are, as a matter of law, to be treated as co-insureds under the landlord's policy has no valid foundation. The supposed basis for that conclusion is that the tenant has an insurable interest in continued possession of the leased premises, and that may be so, but it does not make the tenant a co-insured. If, as a result of a fire, the premises becomes uninhabitable or, as is commonly the case, the lease itself terminates, the tenant would have no right of recovery under the landlord's policy for the loss of possession, unless the policy provides such coverage. Nor can the landlord/tenant relationship properly be compared to a permissive user in an automobile insurance policy, as the *Sutton* court supposed. Permissive users are regarded as insureds under such a policy because the policy expressly provides coverage for them, usually by including them in the definition of "insured." What a few courts, eager to reach the result ordained in *Sutton,* have done is to regard the tenant as a co-insured for the sole purpose of precluding a subrogation claim, which serves only to make the unsupportable fiction even more tenuous. The *56 Associates* court was absolutely correct: courts have no business adding insureds to an insurance policy in order to achieve their perception of good public policy.

The middle approach, followed by the great majority of courts that have dealt with the issue, provides an adequate and supportable analytical framework. Although that framework makes the analysis largely a case-by-case one, certain general principles emanating from basic contract and subrogation law will control:

---

12. The courts that have denied subrogation on the assumption that the tenant was a co-insured because the tenant was, in fact, paying the insurance premiums never apparently considered whether the expectation by the parties to the insurance contract that subrogation was available served to reduce the premiums and thus inured to the benefit of the tenant.

■ (1) Subrogation claims against tenants are not inherently against public policy. The equitable principles that we noted in *Bachmann, supra,* 316 Md. 405, 559 A.2d 365, and that Couch expounded upon (see *ante,* n. 4), if anything, favor the enforcement of subrogation claims by insurers. Such claims serve to avoid both a double recovery by the landlord and the prospect of a culpable tenant routinely escaping responsibility for his/her negligent conduct. There are, however, two general caveats.

■ (a) First, provisions included in a lease that create or enhance a tenant's liability are subject to the normal rules of contract law. To the extent they may be ambiguous, they are to be construed against the draftsman, and, if the lease is found to be a contract of adhesion and the provisions are found to be unfair, they may be declared invalid as being in violation of public policy. Subject to those and any relevant statutory constraints, a lease provision that makes clear that the tenant is liable for damage to the leased premises caused by the tenant's negligence and that such liability includes a subrogation claim by the landlord's insurer is enforceable.[13] In the face of such a provision, clearly stated, the tenant is ordinarily hard-pressed to assert a contrary expectation.

■ (b) Second, there is no right of subrogation unless there is liability in the first instance by the tenant to the landlord. Because, notwithstanding general common law liability for negligently caused damage, that liability usually emanates from or is tailored by the lease and the reasonable expectations of the parties under the lease, the enforceability of a subrogation claim against a tenant is likely to depend ultimately on the court's construction of the landlord/tenant relationship under the lease.

---

**13.** This is an area in which legislation may be appropriate. It is, after all, the General Assembly that sets the public policy of the State, especially economic and social policy. Both the insurance industry and the landlord-tenant relationship are heavily regulated by statute. If the Legislature wishes to preclude or in some way limit or condition subrogation claims by landlords' insurers against tenants in general or against one or more class of tenants, it is competent to do so.

■ (2) If, and to the extent that, the lease relieves the tenant of liability for fire loss, either generally or as occasioned by the tenant's negligence, there can be no subrogation claim against the tenant because there would be no liability to the landlord in the first place.

■ (3) If, under the lease or by some other commitment, the landlord has communicated to the tenant an express or implied agreement to maintain fire insurance on the leased premises, absent some compelling provision to the contrary, the court may properly conclude that, notwithstanding a general "surrender in good condition" or "liability for negligence" clause in the lease, their reasonable expectation was that the landlord would look only to the policy, and not to the tenant, for compensation for fire loss covered by the policy. That expectation would constitute an implied commitment in the lease to relieve the tenant of liability to the extent of the policy coverage and it, too, would therefore preclude a subrogation claim.

■ (4) If the leased premises is a unit within a multi-unit structure, absent a clear, enforceable provision to the contrary, a court may properly conclude that the parties anticipated and reasonably expected that the landlord would have in place adequate fire insurance covering the entire building and, with respect to damage caused by the tenant's negligence to parts of the building beyond the leased premises, would look only to the policy, to the extent of its coverage, for compensation. That expectation has a rational and practical basis. Whatever general common law liability a tenant may have for damage to another person's property caused by the tenant's negligence, it is not likely, unless faced with a very clear contractual obligation to the contrary, that the tenant is thinking beyond the leased premises or, as a practical matter, would be able to afford, or possibly even obtain, sufficient liability insurance to protect against such an extended loss. Nor should the law encourage the economic waste that would result from multiple layers of insurance by the individual tenants to cover the same loss.

Within the construct of these principles, a court must look at the lease as a whole, along with any other relevant and admissible evidence, to determine if it was reasonably anticipated by the landlord and the tenant that the tenant would be liable, in the event of a fire loss paid by the landlord's insurer, to a subrogation claim by the insurer. In terms of the two cases now before us:

As to *Rausch*, we answer the certified questions as follows:

 (1) Maryland does not subscribe to the doctrine of "implied co-insureds" as enunciated in *Sutton*, namely, that, absent an express provision to the contrary, a tenant is, as a matter of law, an implied co-insured of the landlord;

(2) Whether Allstate is barred from bringing the instant subrogation action against the tenants of its insured will depend on the determination by the certifying court of the reasonable expectations of Dunlop and the Rausches, applying the principles of Maryland law set forth in this Opinion.

 As to *Harkins*, to the extent that the $83,000 claim by Harford included payments made for damage to parts of the building beyond the leased premises, summary judgment was properly granted. On the state of this record, however, we hold that summary judgment was inappropriate with respect to liability for amounts paid by Harford to repair damage done to the leased premises.

Although the motion for summary judgment was not based just on the *Sutton* principle of co-insurance, the summary judgment itself was founded solely on that principle, which we have rejected. The lease required Ms. Harkins to obtain "Renter's Insurance for the apartment," and she did, in fact, obtain such a policy. Neither that policy nor its terms are in the record before us, however, so we cannot determine, as a matter of law, what the reasonable expectations of the parties were with respect to damage to the leased premises. Having concluded that there was sufficient evidence of negligence on Ms. Harkins's part to create a triable issue, the court will have to examine the lease and such other admissible evidence in

order to determine whether there is a triable issue as to the reasonable expectation of the parties, and, if necessary, deal further with the issue of Ms. Harkins's negligence.

IN MISC. NO. 6 (RAUSCH), QUESTIONS ANSWERED AS HEREIN SET FORTH, COSTS TO BE EQUALLY DIVIDED BETWEEN THE PARTIES; IN NO. 128 (HARFORD MUTUAL), JUDGMENT OF CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS IN CONFORMANCE WITH THIS OPINION INCLUDING, IF NECESSARY, RESOLUTION OF THE ISSUE OF HARKINS'S NEGLIGENCE; COSTS TO BE EQUALLY DIVIDED BETWEEN THE PARTIES.