328 So.2d 706 (1976)
AMERICAN GUARANTY & LIABILITY INSURANCE COMPANY, Plaintiff-Appellee,
v.
Gray LITTLE, Jr., et al., Defendants-Appellants.
No. 5331.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1976.
*707 Raggio, Farrar, Cappel & Chozen by Stephen A. Berniard, Jr., Lake Charles, Holt & Woodley by Edmund E. Woodley, Lake Charles, for defendant-appellant.
Brame, Bergstedt & Brame by Joseph A. Brame, Lake Charles, for plaintiff-appellee.
Before CULPEPPER, DOMENGEAUX and PAVY, JJ.
DOMENGEAUX, Judge.
This is a subrogation suit by plaintiff-appeellee, American Guaranty & Liability Insurance Company, to recover the sum of $10,544.51 which amount it paid to its insureds, Bryan Bell, and Streuby Drumm d/b/a Suffolk Manor Apartments, Lake Charles, Louisiana, for property losses sustained on February 9, 1973, when a fire broke out in apartment number 148 of the complex. Made defendants in the suit are Gray Little, Jr., his insurer, Travelers Insurance Company, and Fisher Radio Corp.
After trial on the merits the District Court concluded that the fire causing the damages sued for resulted from the joint negligence of the defendant Gray Little, Jr. (the owner of the Fisher Model 390 stereo receiver referred to hereafter) and Fisher Radio Corporation (the manufacturer of said unit), and rendered judgment accordingly against those defendants and Travelers Insurance Company.
Defendants have appealed suspensively to this court. We affirm.
We find that the trial judge has adequately and correctly treated the facts and circumstances surrounding the fire and its cause, and we quote in part from his written reasons as follows:
"A fire occurred in Apartment 148 of the Suffolk Manor Apartments on February 9, 1973. At that time the apartment was leased to Gray Little, Jr., William H. Hines and Erwin A. Burge, Jr. The fire originated in the living room of the apartment. It originated at precisely the point where a Fisher Model 390 receiver was located. The Fisher receiver was a part of a stereo component system which consisted of the receiver, a record changerplayer, and two speakers . . .
The Fisher 390 stereo receiver was a combination radio and amplifier. Its radio function received AM and FM signals and its amplifier function amplified those signals. Its amplifier also amplified the signals received from other sources such as a record player. There was a Garrard record player attached to the receiver by wires. There were also two speakers attached to the receiver by wires. The speakers were on either side of the receiver and the record player was on one side of it, all on the floor. The receiver was sitting on the floor, which was covered by a shag carpet. The receiver was plugged into a wall receptacle. Mounted directly above the receiver was a table model television set which was also plugged into that same receptacle.

*708 The Fire Chief of the City of Lake Charles, Pete Cascio, testified that the fire started at the base of the south wall of the living room at the precise location occupied by the receiver. He said that the fire was put out with 70 gallons of water sprayed a little over 30 seconds. The receiver itself was burned almost beyond recognition. The shell of the metal box in which the electronic parts were housed was recognizable but everything that could be subject to ignition was burned out of and off of its contents. Likewise burned beyond recognition was the television set above it. However, none of the parties to the case thought enough about the television set and its possible contribution to this fire to have it examined or produced in court.
The chassis of the receiver was metal and it had numerous ventilation holes in it on the bottom and the top. The chassis sat upon short plastic feet estimated by the court to be ½ to ¾ high by comparison to a new Model 390 which was introduced in evidence for comparison purposes. When the set was mounted on shag carpet, it is obvious that these feet would sink to the floor and cause the fabric of the carpet to impede free air flow through the ventilation holes on the bottom of the chassis.
When Mr. Little bought this stereo receiver from Fisher he was furnished with a booklet entitled `Operating Instructions Manual' and this booklet contained the following language:
`While installation is relatively simple, certain precautions must be observed. PLEASE KEEP IN MIND THAT OUR WARRANTY DOES NOT COVER DAMAGE CAUSED BY MISHANDLING, MISUSE, EXCESSIVE LINE VOLTAGE, OR INSUFFICIENT VENTILATION. We therefore urge you to follow the instructions in this section (Keyed to figure 1) carefully and in sequence; you may then proceed directly to the [sicnext] section, OPERATING THE RECEIVER.'
Additionally, the operating instructions contained the following language:
`Place the receiver on any conveniently located shelf or table that is away from radiators, warm-air ducts, or other sources of heat. Never place the unit on a soft [sicor] yielding surface; this could impede ventilation through the underside of the chassis. Allow at least two inches clearance above and behind the unit for ventilation.'
The evidence convinced me beyond any doubt that the fire originated in the receiver. The firemen who testified explained that any fire takes a classic V pattern and that based upon that classic pattern, they could pinpoint the origin of the fire as the space occupied by the receiver. Additionally, there was the highly incriminating (so far as the receiver is concerned) showing that material from the shag carpet was baked onto the bottom side of the receiver which was sitting on the shag carpeted floor. Furthermore, only the receiver and the television set which was directly above it were totally burned. The record changer which was to the side of the receiver was not so badly damaged by fire and the speakers not as much as the record changer. In fact, only those sides of the speakers facing the receiver were charred.
A considerable amount of testimony by way of experts was introduced by the defendants. Their purpose in eliciting this testimony was to show that the fire could not have started with the receiver. A Fisher representative who qualified as an electrical engineer testified by deposition that the fire could not have *709 started in the receiver. Also, defendants used a local electronics expert in whom the court has much confidence, and he testified that it was unlikely that the fire started from the receiver. Plaintiff produced an electrical engineer of equal qualifications to the defendants' experts who explained that the fire could have originated with the Fisher product.
While the court has much respect for the experts testifying on behalf of defendants, the essential and unchanging fact that stands out in this case that renders their testimony useless to the court is that the fire did in fact start with the Fisher receiver.
The evidence so completely preponderates that the fire originated in the receiver that the court has little difficulty in making this determination of fact. There is no other point of origin that reason more compelling dictates was the cause than the receiver. To deny that the receiver was the source of the fire is almost the same as denying the fire itself.
The mechanics of how it happened is a question the court cannot answer, two of the experts could not answer, and one thought he could answer. The Fisher expert testified that the printed circuit boards in the set are made of flame retardant material to meet UL requirements. I cannot accept an explanation of why flame retardant material is used on a printed circuit board in an electronic instrument if that material has no usefulness in retarding flames. This witness also testified that the power transistors in that set are mounted on a `heat sink' the purpose of which is to `conductoff' heat generated by transistors Obviously, these transistors generate a certain amount of heat. Heat produces fire. The operating instructions advised owners to `never place the unit on a soft yielding surface; this could impede ventilation through the underside of the chassis." (Underscoring by the court) In view of what happened, I cannot accept an explanation that the hazard which this warning was intended to avoid was limited to the proper operation of the equipment rather than fire.
The fire occurred late in the afternoon. The three boys who occupied the apartment had left the apartment earlier that morning. There was testimony that sometimes the receiver was left on by accident, not by choice, because Mr. Gray did not want the receiver left on when no one was present. However, it sometimes happened that the receiver was left on. Mr. Gray came into the apartment at noon on the day of the fire but he went only as close to the amplifier as the kitchen telephone, several feet away, and it cannot be determined from the testimony if he noticed whether the amplifier was on or not on. The fire occurred late in the afternoon when no one was present in the apartment. The burned out receiver was not examined by professionals until months after the fire. Because of that, the court cannot place any reliance upon testimony as to the position of the onoff switch when it was examined. Only the shaft remained of that switch after the fire. The defendants attempted to show that because one of their experts concluded that the switch was in an off position when he saw it (judging from the position of the flat side of the shaft that was once part of the onoff switch), the set was off when the fire occurred. This proves only one thing, and that is that the set was off at the time the professional examined it. It does not prove that the set was off at the time of the fire.

*710 Defendants also attempted to show that the television set might have caused the fire. This was an early model TV set that had a remote control tuning device unfortunately tuned to a frequency that could be matched by a multitude of everyday soundskeys rattling or being thrown on a formica shelf, airplanes passing overhead, the telephone, doors slamming. The result was that this peculiar television came on unpredictably. The Fisher expert was eager to blame the television set as the culprit, despite the fact that the TV is an electronic device that presumably would have as many fail-safe gadgetry in its system as any other electronic piece of equipment. We considered very carefully the possibility the fire could have been caused by the television set, especially considering its complete state of destruction apparently equaling that of the receiver.
The problem in laying the blame on the TV set is the classic V pattern of fires. If the TV set had caught fire first, it is simply inconceivable that the receiver beneath it could have been so completely destroyed, and nearby objects, such as the turntable and speakers, only relatively damaged. The classic V pattern principle convinces me that the fire had to originate with the receiver and not the TV set no matter how old and eccentric it was.
Given a condition of abnormal heat, such as we have here with the ventilation ducts closed in the receiver, it is logical to conclude that the abnormal heat produced fire. In view of the conflict in expert testimony and the court's limitations as to personal knowledge of matters electronic, I cannot trace the precise events between abnormal heat and fire. But, it is clear there was abnormal heat in the receiver and the fire originated in the receiver. The facts and circumstances suggest the negligence of Gray Little, Jr. rather than some other factor, as the most plausible explanation. The `Operating Instruction Manual' was explicit. Not only were the instructions explicit, but human experience would suggest that it is unsafe to place an electronic instrument equipped with ventilation holes onto a surface which would stop up those ventilation holes. If the negligence of Little needs further definition, it may be supplied by res ipsa loquitor. I rely herein upon Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621; Fireman's Fund Insurance Company v. United States Fidelity & Guaranty Company, 276 So.2d 754 (3rd Cir., 1973); Wilson v. Four States Realty Company, Inc., 276 So.2d 810 (3rd Cir. 1973); Clark v. Central Louisiana Electric Company, Inc., 284 So.2d 621 (3rd Cir., 1973); and, Hanover Insurance Company v. Jacobson-Young, Inc., 294 So.2d 564 (4th Cir. 1974)."
Other possible causes of the fire were the wall receptacle and wiring, the speakers, the television and the turntable. The record strongly preponderates that none of these sources caused the fire.
We conclude, for the reasons of the District Judge hereinabove set forth that defendant, Gray Little, Jr. was negligent in placing the Fisher 390 stereo receiver on the shag carpet which obstructed the ventilation holes on the bottom of the set, thereby causing the fire.
Concerning the negligence of the defendant manufacturer, Fisher Radio Corp., the District Judge found that said corporation was negligent in failing to warn the consumer of the fire hazard which could result from the location of its stereo receiver on a soft, yielding surface. The "Operating Instructions Manual" does not warn, caution or suggest that fire may result by an impeding of the ventilation on the underside of the receiver chassis.
*711 The case of Rey v. Cuccia, 298 So.2d 840 (La.1974) dealt with a situation wherein the seller had installed a trailer hitch six inches higher than had been recommended by the manufacturer of the camper trailer. After having been pulled for approximately 200 miles on paved highways, the camper trailer virtually collapsed. Concerning the responsibility of the manufacturer, our Supreme Court stated:
". . . . There is no warning that there might be such damage occasioned as was here by the failure to so install the hitch. If the trailer were so constructed that such a slight deviation from a recommended procedure of installation of the hitch would cause this type of damage, then this constitutes a defect for which the manufacturer would be responsible, absent at least some warning of the danger involved. . . ."
If the manufacturer was liable as in Rey for failing to warn of the danger involved with a slight deviation from a recommended procedure, then, a fortiori, the manufacturer herein, Fisher, is responsible for failing to warn of the hazard of a gross deviation.
Considering that the fire in the instant case was caused by placing the ventilated bottom of the unit on a soft, yielding shag rug, thereby obstructing the ventilation, we conclude that the defendant Fisher was obligated not only to warn that such placing would impede ventilation, but also to warn that said action could cause fire.
Accordingly, we agree with the trial judge that the defendant Fisher is also liable for its failure to warn of the danger involved. For the above and foregoing reasons the judgment of the District Court is affirmed.
All costs at trial and on appeal to be assessed equally against defendants Travelers Insurance Company and Fisher Radio Corp.
Affirmed.