RAM MUTUAL INSURANCE COMPANY, Appellant,

v.

Rusty ROHDE d/b/a Studio 71 Salon, Respondent.

No. A10–2146.

Supreme Court of Minnesota.

Sept. 5, 2012.

John Neal, Kirby Dahl, Willenbring, Dahl, Wocken & Zimmermann, PLLC, Cold Spring, MN, for appellant.

Matthew W. Moehrle, Rajkowski Hansmeier Ltd., Saint Cloud, MN, for respondent.

## OPINION

GILDEA, Chief Justice.

In this subrogation action, appellant RAM Mutual Insurance Company seeks to

recover payment it made to its insured for the repair of water damage allegedly caused by the negligence of respondent Rusty Rohde, the commercial tenant of RAM's insured. The district court granted Rohde's motion for summary judgment, dismissing RAM's subrogation claim as a matter of law, relying on the court of appeals decision in *United Fire & Casualty Co. v. Bruggeman*, 505 N.W.2d 87 (Minn.App.1993), *rev. denied* (Minn. Oct. 19, 1993). The court of appeals affirmed. *RAM Mut. Ins. Co. v. Rohde*, 805 N.W.2d 554, 557 (Minn.App.2011). We reject the rule from *Bruggeman* and conclude that the question of whether an insurer may pursue a subrogation action against the tenant of an insured, when the tenant's negligence caused damage to the insured's property, must be answered by examining the unique facts and circumstances of each case. Therefore, we reverse and remand.

This action arises out of the landlord and tenant relationship between JD Property Management, LLC, and Rusty Rohde. JD Property owns a rental property in Sauk Centre, Minnesota, containing three business suites. Rohde rents one of the suites and operates a salon business, the Studio 71 Salon, in the leased premises. Rohde's rental is governed by a 5–year commercial lease agreement (the "lease") with JD Property.

After taking possession of the leased premises, Rohde replaced two pedicure chairs in his salon and installed water lines serving the chairs. In February 2008, one of the water lines allegedly burst, causing water damage to the Studio 71 Salon suite as well as an adjacent suite. JD Property filed an insurance claim with its property insurer, RAM, requesting payment for the water damage. RAM paid JD Property $17,509, the full amount of JD Property's claim, to repair the damage.[1] Because Rohde had installed the water line, allegedly without JD Property's knowledge in violation of the lease, RAM filed a subrogation action against Rohde, asserting breach of contract, negligence, and promissory estoppel. As subrogee of JD Property, RAM sought recovery of the $17,509 paid to JD Property for repair of the damage at the insured premises.

Rohde brought a motion for summary judgment, relying upon a line of cases from the Minnesota Court of Appeals beginning with *United Fire & Casualty Co. v. Bruggeman*, 505 N.W.2d 87 (Minn.App. 1993), *rev. denied* (Minn. Oct. 19, 1993). Rohde argued that *Bruggeman* barred RAM's subrogation claim, regardless of whether Rohde was at fault for the losses occasioned by the water damage, because Rohde "as a tenant, is a co-insured under the RAM policy." The district court granted Rohde's motion, determining that resolution of the case was governed by *Bruggeman.* Based on *Bruggeman,* the district court found that Rohde was a co-insured for purposes of JD Property's insurance policy. Because general principles of insurance law prohibit an insurer from bringing a subrogation claim against a co-insured, *see* 16 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 224:1 (3d ed.1995), the court dismissed RAM's complaint with prejudice as a matter of law.

The court of appeals affirmed. *RAM Mut. Ins. Co. v. Rohde,* 805 N.W.2d 554

---

1. While the parties dispute at length whether the insurance policy of JD Property or Rohde provided primary coverage for the loss at issue, RAM has at no time claimed that the damage at issue in this case was not a covered loss under JD Property's insurance policy, or that RAM improperly paid the claim because it was only an excess insurer. Moreover, RAM has never sought contribution from, or filed a declaratory judgment action against, Rohde's insurance provider. Therefore, we assume without deciding that the water damage at issue was a covered loss under the insurance policy issued by RAM.

(Minn.App.2011). The court determined that the lease placed no express obligation on either JD Property or Rohde to procure property insurance providing coverage for the water damage at issue, and that under *Bruggeman*, Rohde was a co-insured under the RAM insurance policy. *Id.* at 556. Because Rohde was a co-insured, the court held that "RAM cannot maintain a subrogation action against Rohde." *Id.* at 557. We granted RAM's petition for review.

## I.

This case presents the question of whether an insurer may maintain a subrogation action against the insured's negligent tenant.[2] Subrogation "is the substitution of another person in place of the creditor to whose rights he or she succeeds in relation to the debt, and gives to the substitute all the rights, priorities, remedies, liens, and securities of the person for whom he or she is substituted." 16 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 222:5 (3d ed.1995). In the insurance context, subrogation "involves the substitution of an insurer (subrogee) to the rights of the insured (subrogor)." *Medica, Inc. v. Atl. Mut. Ins. Co.*, 566 N.W.2d 74, 76 (Minn.1997). Upon payment of a loss, the insurer is subrogated in a correspond-

**2.** In this appeal we are asked to determine whether a subrogation action may be brought when an insurer seeks recovery from an insured's tenant. For purposes of our analysis, we assume that Rohde was at fault for the water damage at issue such that RAM would be able to maintain a subrogation action, provided that such an action may properly be brought. We do not decide whether Rohde was in fact negligent or in breach of his lease with respect to the water damage.

We also acknowledge that the law recognizes two types of subrogation: equitable and conventional. *Medica, Inc. v. Atl. Mut. Ins. Co.*, 566 N.W.2d 74, 77 (Minn.1997). Equitable subrogation arises out of equitable principles even in the absence of a specific agreement. *See* 73 Am.Jur.2d *Subrogation* § 5 (2012). A right to conventional subrogation, on the other hand, is created by a contractual agreement between an insured and an insurer "that the party paying the debt will have the rights and remedies of the original creditor." *Id.* § 4. Because all subrogation claims are based in equity, however, "even when the right to subrogation is contractual, the terms of the subrogation will be governed by equitable principles, unless the contract clearly and explicitly provides to the contrary." *Medica*, 566 N.W.2d at 77. There is evidence of a contractual right to subrogation in JD Property's liability and property insurance policies which both contain clauses providing that "[i]f the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to

[RAM]." But courts have suggested that when "insurers that are obligated by a *preexisting* contract to pay the losses of an insured proceed in a subsequent action against the responsible party," the insurer proceeds "under the theory of equitable subrogation, and not conventional subrogation." *Wasko v. Manella*, 269 Conn. 527, 849 A.2d 777, 781–82 (2004); *see also* Spencer L. Kimball & Don A. Davis, *The Extension of Insurance Subrogation*, 60 Mich. L.Rev. 841, 842 (1962) (explaining that "[a]lthough subrogation clauses are very common in insurance policies, on the whole they merely confirm rights that would exist without them"). Because even in the absence of an express reservation of subrogation rights in an insurance policy "it is the universal rule that upon payment of a loss, an insurer is entitled to pursue those rights which the insured may have against a third party whose negligence or wrongful act caused the loss," *Great N. Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 291 Minn. 97, 99, 189 N.W.2d 404, 406 (1971), it is immaterial to the resolution of this case whether RAM's subrogation rights stem from the insurance contract or whether they arise out of the equitable powers of the court. Therefore, we need not, and do not decide whether RAM's subrogation claim in this case is contractual or equitable in nature. Moreover, the subrogation language in RAM's insurance policy does not significantly expand or contract its equitable right to subrogation, suggesting that our analysis would be the same regardless of the source of the subrogation right.

ing amount to the insured's right of action against any third party whose wrongful conduct caused the loss. *See Blair v. Espeland,* 231 Minn. 444, 446, 43 N.W.2d 274, 276 (1950); *see also Buell v. United Firemen's Ins. Co.,* 167 Minn. 183, 185, 208 N.W. 819, 820 (1926). Subrogation arises "only with respect to rights of the insured against third persons to whom the insurer owes no duty"; consequently, "it has long been held that no right of subrogation can arise in favor of an insurer against its own insured." Russ & Segalla, *supra,* § 224:1; *see also Wager v. Providence Ins. Co.,* 150 U.S. 99, 108, 14 S.Ct. 55, 37 L.Ed. 1013 (1893). This basic principle extends to prohibit an insurer from bringing a subrogation action against its co-insured. *See Rausch v. Allstate Ins. Co.,* 388 Md. 690, 882 A.2d 801, 807 (2005) (explaining that there can be no subrogation of an insurer against its own insured "because, as subrogee, the insurer stands in the shoes of the insured," and subrogation against an insured would therefore "essentially involve the insured suing himself to recover damages he sustained by his own conduct").

■ In response to Rohde's motion for summary judgment, the district court concluded that subrogation was not available based on the court of appeals decision in *United Fire & Casualty Co. v. Bruggeman,* 505 N.W.2d 87 (Minn.App.1993), *rev. denied* (Minn. Oct. 19, 1993). When considering an "appeal from summary judgment, we must determine whether there are any genuine issues of material fact, and whether the lower court erred in its

application of the law." *Olmanson v. Le-Sueur Cnty.,* 693 N.W.2d 876, 879 (Minn. 2005). We review the district court's "legal decisions on summary judgment under a de novo standard," *SCI Minn. Funeral Servs., Inc. v. Washburn–McReavy Funeral Corp.,* 795 N.W.2d 855, 861 (Minn.2011), and "view the evidence in the light most favorable to the party against whom judgment was granted," *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993).[3]

### A.

Because the district court and court of appeals determined that *Bruggeman* was dispositive, we turn first to a discussion of that case. In *Bruggeman,* the court of appeals sought to interpret the application of basic subrogation principles to the specific question of when a landlord's insurer may bring a subrogation action against the landlord's negligent tenant. 505 N.W.2d at 88. The case arose when the landlord's property insurer brought a subrogation action against the tenants, alleging that the tenants had negligently caused fire damage to the landlord's building. *Id.* No written lease governed the landlord-tenant relationship, and the parties had no agreement regarding the provision of fire insurance. *Id.* But the landlord had purchased insurance, which provided coverage for the damage at issue. *Id.*

The *Bruggeman* court, following what it described as the "the majority position," determined that "the landlord and the tenant were co-insureds because each had an insurable interest in the proper-

---

**3.** While subrogation is an equitable remedy, a standard of review more deferential than de novo, which may be applicable on appeal from summary judgment "where, after balancing the equities, the district court determines not to award equitable relief," is not applicable here where the district court determined as a matter of law that RAM could not maintain a subrogation action. *See SCI*

*Minn. Funeral Servs.,* 795 N.W.2d at 860–61 (reviewing de novo the district court's ruling as a matter of law "that the requirements for rescission and reformation were not met" explaining that we review legal decisions on summary judgment de novo and "[t]hat standard of review does not change simply because the claims at issue are for equitable relief").

ty—the landlord a fee interest and the tenant a possessory interest." *Id.* at 88–89. The court grounded this result in its determination that by paying rent, tenants indirectly pay a landlord's insurance premiums. *Id.* at 89. Because an insurer cannot bring a subrogation action against its own insured, the court concluded that the tenants, as co-insureds of the landlord, were "not subject to subrogation" by the insurer. *Id.* at 90.

The court further reasoned that denying subrogation efficiently allocated economic resources because if "each tenant is responsible for all damages arising from its negligence in causing a fire and if each tenant was therefore responsible for its own fire insurance, the same property would be insured many times over." *Id.* at 89. Moreover, the court stated that its holding that a landlord and tenant were co-insureds was consistent with the expectations of an insurer insuring rental property. *Id.* Even though an insurer "may not have control over who the individual tenants are," the court determined that "[t]he insurer knows the risk it is undertaking when insuring a rental property" and "can increase its premiums to reflect increased risks presented by changing tenant use." *Id.*

The court of appeals has followed the *Bruggeman* approach as the default rule in cases in which the parties to a lease have no express agreement regarding the procurement of insurance to cover the particular loss at issue. *See, e.g., Bigos v. Kluender,* 611 N.W.2d 816, 822 (Minn.App.2000) (explaining in a case of fire damage that the *Bruggeman* rule applies "unless an express agreement was entered into between the insured and its tenant requiring the tenant to carry its own fire insurance"), *rev. denied* (Minn. July 25, 2000); *St. Paul Cos. v. Van Beek,* 609 N.W.2d 256, 257–58 (Minn.App.2000), *rev. denied*

(Minn. June 27, 2000). The court of appeals has extended *Bruggeman* to circumstances in which property damage occurs and a lease requires a tenant to carry insurance for liabilities and business operations, but does not require the tenant to carry property insurance. *See Blohm v. Johnson,* 523 N.W.2d 14, 16 (Minn.App. 1994). The court of appeals has, however, declined to extend *Bruggeman* to nonstructural and uninsured losses. *See Nuessmeier Elec., Inc. v. Weiss Mfg. Co.,* 632 N.W.2d 248, 252 (Minn.App.2001) (explaining that because "*Bruggeman*'s rationale relies on the landlord and tenant's shared insurable interest which is limited to the structure ... the doctrine does not shield a tenant from liability for nonstructural losses" or from "losses incurred by the owner that are not covered by insurance"), *rev. denied* (Minn. Oct. 16, 2001).

### B.

With this background in mind, we turn to the parties' arguments regarding the applicability of *United Fire & Casualty Co. v. Bruggeman,* 505 N.W.2d 87 (Minn. App.1993), *rev. denied* (Minn. Oct. 19, 1993). We begin with the preliminary question of whether *Bruggeman* is applicable in this case. This is a threshold question because if we determine that the rule from *Bruggeman* is inapplicable to the facts presented here, we would not need to address RAM's argument urging us to reject *Bruggeman.*

Rohde argues that *Bruggeman* controls because the lease did not contain an express provision requiring either Rohde or JD Property to purchase insurance covering water damage to the property, and therefore Rohde must be considered a co-insured on JD Property's insurance. Because an insurer cannot maintain a subrogation action against its own insured or a co-insured, *see U.S. Fire Ins. Co. v. Am-*

*mala,* 334 N.W.2d 631, 634 (Minn.1983), Rohde contends that RAM cannot sue him for negligence and breach of contract.

RAM contends, however, that *Bruggeman* is inapplicable. RAM argues that *Bruggeman* applies only when there is no express agreement between the parties regarding responsibility for the loss at issue and that the lease here contains the requisite express agreement. RAM also contends, in the alternative, that *Bruggeman* is distinguishable on its facts and therefore not applicable.

We turn first to RAM's argument that *Bruggeman* does not apply because, unlike in *Bruggeman,* the lease here contains an express agreement that requires Rohde to pay for the damages he caused. The lease between JD Property and Rohde contains several provisions potentially relevant to the question of Rohde's responsibility for repairing the water damage. For example, the lease places several obligations on Rohde with respect to insurance. Under the heading "Insurance," the lease provides:

25. The Tenant is hereby advised and understands that the personal property of the Tenant is not insured by the Landlord for either damage or loss, and the Landlord assumes no liability for any such loss. The Tenant is advised that, if insurance coverage is desired by the Tenant, the Tenant should inquire of Tenant's insurance agent regarding a Tenant's Policy of Insurance.

26. The Tenant is responsible for insuring the Premises for liability insurance for the benefit of the Tenant and the Landlord.

27. The Tenant will provide proof of such insurance to the Landlord upon the issuance or renewal of such insurance.

Rohde obtained an insurance policy providing third-party liability coverage as required by Paragraph 26 of the lease. Rohde's liability insurance insured the premises that Rohde leased, and through an endorsement included coverage for property damage to "[p]roperty you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property." Rohde's policy also included the coverage recommended in Paragraph 25 of the lease, providing first-party property insurance covering Rohde's personal property.[4]

The lease also contains several provisions relevant to this case governing the obligations of JD Property and Rohde relating to alterations of, and damages to, the leased premises. Under the heading "Tenant's Repairs and Alterations," the lease provides:

35. The Tenant covenants with the Landlord to occupy the Premises in a tenant-like manner and not to permit waste. The Tenant will at all times and at its sole expense, subject to the Landlord's repair, maintain and keep the Premises, reasonable wear and tear, damage by fire, lightning, tempest, structural repairs, and repairs necessitated from hazards and perils against which the Landlord is required to insure excepted. Without limiting the generality of the

---

4. JD Property also purchased both first-party property and third-party liability insurance from appellant RAM. The RAM policy insured the entire rental property, including Rohde's leased premises, against claims arising out of damage or injuries sustained by third-persons on the property, as well as direct physical loss or damage to the rental property.

foregoing, the Tenant will keep, repair, replace and maintain all glass, wiring, pipes and mechanical apparatus in, upon or serving the Premises in good and tenantable repair at its sole expense. . . .

37. The Tenant will not make or have others make alterations, additions or improvements or erect or have others erect any partitions or install or have others install any trade fixture, exterior signs, floor covering, interior or exterior lighting, plumbing fixtures, shades, awnings, exterior decorations or make any changes to the Premises or otherwise without first obtaining the Landlord's written approval thereto. . . .

Additionally, RAM notes that the lease obligates JD Property to make certain repairs to the leased premises, providing:

42. The Landlord covenants and agrees to effect at its expense repairs of a structural nature to the structural elements of the roof, foundation and outside walls of the Building, whether occasioned or necessitated by faulty workmanship, materials, improper installation, construction defects or settling, or otherwise, unless such repair is necessitated by the negligence of the Tenant, its servants, agents, employees or invitees, in which event the cost of such repairs will be paid by the Tenant together with an administration fee of fifteen percent (15%) for the Landlord's overhead and supervision.

The lease also specifies that at the end of the lease term "the Tenant will quit and surrender the Premises in as good a state and condition as they were at the commencement of this Lease, reasonable use and wear and damages by the elements excepted." Upon termination of the lease, Rohde agreed to be liable for the "reasonable expenses as the Landlord incurs . . . in . . . keeping the Premises in good order, repairing the same and preparing them for reletting."

RAM advances three arguments to support its theory that, based on the provisions discussed above, the lease contains an express agreement obligating Rohde to pay for damages caused by his negligence. First, RAM argues that the lease expressly required Rohde to obtain liability insurance covering the water damage that occurred. Second, RAM argues that the clause requiring Rohde to surrender the leased premises "in as good a state and condition as they were at the commencement of this lease," constitutes an express agreement allocating responsibility to the tenant for any water damage. Third, RAM argues that because the lease expressly "required the landlord to insure against the peril of fire," but did not require that JD Property insure against any other hazards, the parties must have intended for Rohde to insure the property against perils other than fire. Based on its conclusion that there was an express agreement between the parties, RAM contends that *Bruggeman* is inapplicable. We disagree.

At most, RAM's arguments identify clauses in the lease that *implicitly* define expectations regarding which party to the lease would be responsible for the type of water damage that occurred here. No part of the lease expressly places responsibility upon Rohde to insure against or bear responsibility for water damage. *See Peterson v. Silva,* 428 Mass. 751, 704 N.E.2d 1163, 1165 (1999) (finding no express agreement when the lease required the tenants to "indemnify [the landlord] from all loss resulting from their carelessness, neglect, or improper conduct" because "the

lease's general language [wa]s not sufficient to create liability in the tenants" for losses from a negligently-caused fire). Our analysis of the lease establishes that, similar to *Bruggeman*, there was no express agreement between the parties as to who would bear the financial responsibility for the damage at issue in this case.

In addition to its argument that *Bruggeman* does not apply because the lease contains an express agreement allocating responsibility, RAM also argues that *Bruggeman* is factually distinguishable in several respects. Specifically, RAM argues that *Bruggeman* is inapplicable because *Bruggeman* involved fire rather than water damage; dealt with a residential, not a commercial, lease; and involved com-

plete destruction, instead of minor damage, to the leased property. While RAM correctly identifies factual differences between *Bruggeman* and this case, RAM fails to provide any reason why these factual differences would compel a different legal conclusion if this court were to apply the rule of law from *Bruggeman* in this case.[5] We turn to that question now.[6]

## II.

■ Courts have followed three different approaches in answering the question of whether an insurer may maintain a subrogation action against an insured's negligent tenant. *See Tri–Par Invs., L.L.C. v. Sousa*, 268 Neb. 119, 680 N.W.2d 190, 194

---

5. Indeed, courts following *Bruggeman* have applied its rule regardless of the extent of damage. *See, e.g., Bigos*, 611 N.W.2d at 819, 822–23 (applying *Bruggeman* where the fire occurred only on an apartment balcony). The *Bruggeman* rule has also been applied in cases involving commercial leases. *See St. Paul Cos.*, 609 N.W.2d at 256–57 (lease for an electronic manufacturing service); *Blohm*, 523 N.W.2d at 15 (lease for a plumbing business).

6. RAM argues that in *Osborne v. Chapman*, 574 N.W.2d 64 (Minn.1998), we implicitly rejected the *Bruggeman* rule, and that *Osborne* requires that we determine whether an insurer may maintain a subrogation action against an insured's negligent tenant based on the particular facts and circumstances of each case. Rohde contends that *Osborne* is not dispositive. We agree with Rohde. *Osborne* involved a direct action by a landlord against a tenant to recover for fire damage, and we considered "whether a negligent tenant is impliedly a 'co-insured' under an insurance policy held by the landlord which provides coverage for lost rents." 574 N.W.2d at 65. We concluded that, with respect to insurance coverage against lost rental income, landlords and tenants were not co-insureds, and explained that "[s]uch coverage plainly exists for the benefit of the landlord, not the tenant, for it is the landlord whose income from the rental property is cut off when a casualty renders the premises uninhabitable." *Id.* at 67. Unlike "the respective real property in-

terests" relevant to the *Bruggeman* court's determination that a landlord and tenant were co-insureds, we concluded that "[n]o such property interests exist in future rents." *Id.* Importantly, we explicitly declined to express an opinion "as to whether tenants reasonably rely upon landlords to insure the leased structure against damage by fire, as suggested in ... *Bruggeman*." *Id.* at 67 n. 6. While we did note in *Osborne* that "[u]nder certain circumstances, a landlord and tenant may expressly or implicitly agree to allocate the responsibility for maintaining insurance coverage," *id.* at 68, contrary to RAM's suggestion, *Osborne* does not constitute rejection of the *Bruggeman* rule for several reasons. First, we specifically stated in *Osborne* that we "need not reach" the issue of whether to adopt the *Bruggeman* rule. *Id.* at 67 n. 5. Second, *Osborne* arose in the context of a direct action between a landlord and a tenant, not a subrogation action. *Id.* at 65. Third, our analysis in *Osborne* focused on insurance covering the loss of a landlord's rental income, which does not raise the same issues of the relative property interests of landlords and tenants as does first-party property insurance. *Id.* For these reasons, *Osborne* does not compel a particular conclusion in the present case. Therefore, we proceed to address the question of whether we should adopt the *Bruggeman* rule as a question of first impression.

(2004) (describing the question of whether a landlord's insurer can maintain a subrogation action against a tenant as "a dispute that has raged in subrogation jurisprudence for the last 30 years"). Some courts, like the court of appeals in *Bruggeman*, have adopted a no-subrogation rule, barring insurers from pursuing subrogation claims against negligent tenants in the absence of an express agreement to the contrary. *See, e.g., N. River Ins. Co. v. Snyder*, 804 A.2d 399, 403–04 (Me.2002).[7] A second group of courts has adopted the opposite approach—a pro-subrogation rule that allows insurers to pursue subrogation claims against their insureds' tenants, absent an express agreement governing the provision of property insurance. *See, e.g., Neubauer v. Hostetter*, 485 N.W.2d 87, 89–90 (Iowa 1992).[8] Other jurisdictions have pursued a middle ground, adopting a case-by-case approach to subrogation claims in the landlord-tenant context, by which courts determine the availability of subrogation based on the reasonable expectations of the parties under the facts of each case. *See, e.g., Am. Family Mut. Ins. Co. v. Auto–Owners Ins. Co.*, 757 N.W.2d 584,

---

7. The no-subrogation approach was first developed by the Oklahoma Court of Civil Appeals in *Sutton v. Jondahl*, 532 P.2d 478 (Okla.Civ.App.1975), and is often referred to as the *Sutton* rule. Approximately 14 jurisdictions have adopted the no-subrogation approach in some form. *See Alaska Ins. Co. v. RCA Alaska Commc'ns, Inc.*, 623 P.2d 1216, 1218 (Alaska 1981); *DiLullo v. Joseph*, 259 Conn. 847, 792 A.2d 819, 822 (2002); *Lexington Ins. Co. v. Raboin*, 712 A.2d 1011, 1016 (Del.Super.Ct.), *aff'd*, 723 A.2d 397 (Del. 1998); *Cont'l Ins. Co. v. Kennerson*, 661 So.2d 325, 330–31 (Fla.Dist.Ct.App.1995); *N. River Ins. Co. v. Snyder*, 804 A.2d 399, 403–04 (Me. 2002); *Peterson v. Silva*, 428 Mass. 751, 704 N.E.2d 1163, 1164–65 (1999); *N.H. Ins. Grp. v. Labombard*, 155 Mich.App. 369, 399 N.W.2d 527, 531 (1986); *Tri–Par Invs., L.L.C. v. Sousa*, 268 Neb. 119, 680 N.W.2d 190, 198–99 (2004); *Safeco Ins. Co. v. Capri*, 101 Nev. 429, 705 P.2d 659, 660–61 (1985); *Cambridge Mut. Fire Ins. Co. v. Crete*, 150 N.H. 673, 846 A.2d 521, 523 (2004); *Cmty. Credit Union of New Rockford, N.D. v. Homelvig*, 487 N.W.2d 602, 605 (N.D.1992); *Sutton*, 532 P.2d at 482; *Dattel Family Ltd. P'ship v. Wintz*, 250 S.W.3d 883, 892 (Tenn.Ct.App.2007); *GNS P'ship v. Fullmer*, 873 P.2d 1157, 1163–64 (Utah Ct. App.1994); *Cmty. Ass'n Underwriters of Am., Inc. v. Kalles*, 164 Wash.App. 30, 259 P.3d 1154, 1158 (2011).

8. Approximately 12 jurisdictions have adopted the pro-subrogation approach either explicitly or implicitly. *See, e.g., 56 Assocs. ex rel. Paolino v. Frieband*, 89 F.Supp.2d 189, 193–94 (D.R.I.2000) (interpreting Rhode Island law); *Page v. Scott*, 263 Ark. 684, 567

S.W.2d 101, 103–04 (1978); *Fed. Ins. Co. v. Paulk*, 173 Ga.App. 266, 325 S.E.2d 886, 888 (1985); *Neubauer v. Hostetter*, 485 N.W.2d 87, 90 (Iowa 1992); *N.H. Ins. Co. v. Hewins*, 6 Kan.App.2d 259, 627 P.2d 1159, 1161 (1981); *Britton v. Wooten*, 817 S.W.2d 443, 445–46 (Ky.1991); *Am. Guar. & Liab. Ins. Co. v. Little*, 328 So.2d 706, 710 (La.Ct.App.1976); *Paramount Ins. Co. v. Parker*, 236 Miss. 872, 112 So.2d 560, 560–61 (1959); *Zoppi v. Traurig*, 251 N.J.Super. 283, 598 A.2d 19, 21 (N.J.Sup.Ct. Law Div.1990); *Phoenix Ins. Co. v. Stamell*, 21 A.D.3d 118, 796 N.Y.S.2d 772, 779–80 (2005); *Winkler v. Appalachian Amusement Co.*, 238 N.C. 589, 79 S.E.2d 185, 191–92 (1953); *Wichita City Lines, Inc. v. Puckett*, 156 Tex. 456, 295 S.W.2d 894, 899 (1956). The exact number of jurisdictions adopting the pro-subrogation approach is difficult to ascertain with certainty because when the lease appears to place responsibility for a particular kind of loss upon a tenant the reasoning of a pro-subrogation court may look similar to the analysis undertaken by a case-by-case court. For example, *United States Fidelity & Guaranty Co. v. Let's Frame It, Inc.*, 759 P.2d 819 (Colo.Ct.App.1988), has been characterized as a case adopting the pro-subrogation approach, even though in allowing the insurer to bring a subrogation action, the Colorado court looked to the provisions of the lease to determine whether the parties "intend[ed] to immunize tenant from damages caused to the leased premises by its own negligence." *Id.* at 822; *see Am. Family Mut. Ins. Co. v. Auto–Owners Ins. Co.*, 757 N.W.2d 584, 590 n. 4 (S.D.2008) (including *Let's Frame It* in a list of pro-subrogation courts).

594 (S.D.2008); *Rausch v. Allstate Ins. Co.*, 388 Md. 690, 882 A.2d 801, 814–15 (2005).[9]

We agree with the reasoning of the Maryland Court of Appeals and the South Dakota Supreme Court, in *Rausch* and *Am. Family Mutual Insurance Co.*, and conclude for several reasons that the case-by-case approach "provides an adequate and supportable analytical framework," *Rausch*, 882 A.2d at 815, and is the soundest method to evaluate when an insurer has a subrogation right against an insured's tenant. First, the case-by-case approach is best suited to the areas of law implicated by the subrogation question posed by this case. The question presented by RAM's subrogation action arises at the intersection of insurance law and landlord-tenant law governing the relationship of landlords and tenants. Both areas of law are grounded in contractual relationships, making a rule that reaches a result by examining the parameters of the relationship between an insurer and insured and a landlord and tenant, as defined in the parties' respective contracts, superior to one that makes legal assumptions that do not comport with the parties' reason-able expectations. *See Am. Family Mut. Ins. Co.*, 757 N.W.2d at 594 (concluding that the case-by-case approach "is the best approach to employ in the landlord-tenant context because it applies basic contract principles"). By examining the reasonable expectations of the contracting parties to determine whether subrogation is appropriate in a particular case, the case-by-case approach avoids the legal assumptions of the other approaches, and thus best effectuates the intent of the parties by eliminating presumptions altogether. While the case-by-case approach does not provide the same kind of predictability that accompanies either the pro- or no-subrogation approaches, the case-by-case method provides more predictability to parties by simply enforcing the terms of their contracts.

Second, the case-by-case approach best effectuates the intent of the contracting parties while still taking into account the equitable principles underlying subrogation actions. *See Medica, Inc. v. Atl. Mut. Ins. Co.*, 566 N.W.2d 74, 77 (Minn.1997) (noting that subrogation is based on the equitable principle " 'that no one should be enriched by another's loss' " (quoting 6A

---

9. Many courts have adopted some form of the case-by-case approach. *See, e.g., Gen. Mills, Inc. v. Goldman*, 184 F.2d 359, 366 (8th Cir. 1950); *Regent Ins. Co. v. Econ. Preferred Ins. Co.*, 749 F.Supp. 191, 195 (C.D.Ill.1990); *Gen. Accident Fire & Life Assurance Corp. v. Traders Furniture Co.*, 1 Ariz.App. 203, 401 P.2d 157, 159–60 (1965); *Fire Ins. Exch. v. Hammond*, 83 Cal.App.4th 313, 99 Cal. Rptr.2d 596, 601 (2000); *U.S. Fid. & Guar. Co. v. Let's Frame It, Inc.*, 759 P.2d 819, 823 (Colo.Ct.App.1988); *Bannock Bldg. Co. v. Sahlberg*, 126 Idaho 545, 887 P.2d 1052, 1056 (1994); *Dix Mut. Ins. Co. v. LaFramboise*, 149 Ill.2d 314, 173 Ill.Dec. 648, 597 N.E.2d 622, 625 (1992); *Seaco Ins. Co. v. Barbosa*, 435 Mass. 772, 761 N.E.2d 946, 951 (2002); *Rausch v. Allstate Ins. Co.*, 388 Md. 690, 882 A.2d 801, 814–15 (2005); *Cincinnati Ins. Co. v. Control Serv. Tech., Inc.*, 111 Ohio App.3d 801, 677 N.E.2d 388, 392 (1996); *Koch v.* *Spann*, 193 Or.App. 608, 92 P.3d 146, 152 (2004); *Am. Family Mut. Ins. Co. v. Auto-Owners Ins. Co.*, 757 N.W.2d 584, 594 (S.D. 2008); *Monterey Corp. v. Hart*, 216 Va. 843, 224 S.E.2d 142, 144 (1976). As with the pro-subrogation approach, it is difficult to accurately determine the number of jurisdictions that have adopted the case-by-case approach because, depending on the language of the lease involved, both no-subrogation and pro-subrogation courts have often tied their analysis to the terms of the lease, rendering their analysis very similar to that undertaken by case-by-case courts. *See Rausch*, 882 A.2d at 814 (explaining that most of the courts that have dealt with the issue presented in this case, including some that have been characterized as either no- or pro-subrogation courts "have taken a middle approach" and "looked to the lease as a whole to determine" the parties' expectations).

John A. Appleman, *Insurance Law & Practice* § 4054, at 143 (1972))). Because, as a matter of subrogation law, an insurer merely steps into the shoes of its insured, it would be inequitable to allow, as pro-subrogation courts do, subrogation in cases in which the parties to the lease did not reasonably expect that the tenant would be liable to the landlord for the type of damage at issue. *See Rausch*, 882 A.2d at 816 (explaining that "[i]f, and to the extent that, the lease relieves the tenant of liability" for the type of damage at issue, whether caused by the tenant's negligence or not, "there can be no subrogation claim against the tenant because there would be no liability to the landlord in the first place"). Similarly, it would be inequitable to bar an insurer's subrogation action when the landlord and tenant expected the tenant to be liable for particular damages. Moreover, presumptive, bright-line rules of any kind are in conflict with the basic principles of equity, which by definition require a court to weigh and balance the equities between the parties in determining whether subrogation is available in a particular case. *See Citizens State Bank v. Raven Trading Partners, Inc.*, 786 N.W.2d 274, 285 (Minn.2010).

Finally, the case-by-case method is more consistent with Minnesota's public policy of holding tortfeasors accountable for their actions than the no-subrogation approach adopted by *Bruggeman*. *See Solberg v. Minneapolis Willys–Knight Co.*, 177 Minn. 10, 12, 224 N.W. 271, 272 (1929) (determining that the existence of insurance covering an injured party "is not a fact which lessens the liability of a defendant for a tort"). In the absence of a lease provision to the contrary, a tenant is generally liable in tort to its landlord for damages to the leased property caused by the tenant's negligence. *See* 1 Milton R. Friedman & Patrick A. Randolph, Jr., *Friedman on Leases* § 9:10 (5th ed.2004). The Legisla-

ture has emphasized this public policy in promulgating the statutes that govern the landlord-tenant relationship. For example, Minn.Stat. § 504B.131 (2010) provides that a tenant or occupant of a building that "is destroyed or becomes uninhabitable" may "vacate and surrender such a building" but only provided that the destruction is "through no fault or neglect of the tenant." *See also* Minn.Stat. § 504B.161, subd. 1(a)(2) (2010) (eliminating a landlord's duty to make repairs of residential premises when "the disrepair has been caused by the willful, malicious, or irresponsible conduct of the tenant"). These statutes support the conclusion that, in general, a tenant should be held responsible for damages caused by his own wrongful conduct. The case-by-case approach achieves this purpose by allowing an insurer to bring a subrogation action when the reasonable expectations of the parties, as evidenced by the lease, reveal that the parties did not intend to limit application of the general rule of a tenant's tort liability. Therefore, the case-by-case approach is consistent with the policy that a loss should typically be borne by the person responsible for that loss.

For all of these reasons, we conclude that the case-by-case approach is the framework best suited to ascertaining whether an insurer may maintain a subrogation action against the negligent tenant of its insured. While we could apply that rule on appeal and assess whether the parties' expectations could be determined on this record, we decline to do so for two reasons. First, the district court applied the default rule from *Bruggeman*. Because we have now rejected the *Bruggeman* rule in favor of a case-by-case approach, remand is appropriate to give the district court the opportunity to apply the case-by-case approach. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988)

(explaining that our court "generally consider[s] 'only those issues that the record shows were presented and considered by the trial court in deciding the matter before it' " (quoting *Thayer v. Am. Fin. Advisers, Inc.*, 322 N.W.2d 599, 604 (Minn. 1982), *abrogated on other grounds by Onvoy, Inc. v. SHAL, LLC*, 669 N.W.2d 344 (Minn.2003))); *see also Oganov v. Am. Family Ins. Grp.*, 767 N.W.2d 21, 24 n. 1 (Minn.2009). Second, in addition to issues of contract interpretation, this case also involves the question of equitable relief. The district court is in the best position to "balance the equities of the case and determine whether the equitable remedy . . . is appropriate." *Dakota Cnty. HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn. 1999); *accord Flynn v. Sawyer*, 272 N.W.2d 904, 910 (Minn.1978) (explaining that equitable remedies are "addressed to the sound discretion of the trial court"). But in remanding, we do not suggest that the district court would be unable to determine the availability of subrogation in the present case on summary judgment.

### III.

While the analysis under the approach we have adopted is "largely a case-by-case one," there are general underlying principles of contract, subrogation, and landlord-tenant law that will aid courts that undertake a case-by-case analysis in determining the reasonable expectations of the parties. *Rausch*, 882 A.2d at 815. To provide guidance on remand, we turn next to a discussion of the general principles that inform the application of the case-by-case approach.

To determine whether RAM's subrogation claim is barred under the case-by-case approach, the district court must ascertain the expectations of the parties as to which party bears responsibility for a particular loss. *See Am. Family Mut. Ins. Co. v. Auto–Owners Ins. Co.*, 757 N.W.2d 584, 594 (S.D.2008). The case-by-case analysis begins with the written documents executed by the parties.[10] *See Bannock Bldg. Co. v. Sahlberg*, 126 Idaho 545, 887 P.2d 1052, 1056 (1994) (directing lower courts to "focus on the terms of the lease agreement itself to determine what the reasonable expectations of the parties were as to who should bear the risk of loss for . . . damage to the leased premises"). Examining the lease agreement to determine the expectations of the parties rests on the well-established principle that leases are contracts to which we apply general principles of contract construction. *See Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn.1999) (explaining that "a lease is a form of contract"). The district court therefore should interpret provisions in a lease governing a tenant's liability for a particular loss according to the fundamental principle that the "goal of contract interpretation is to ascertain and enforce the intent of the parties." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 364 (Minn.2009). To this end, provisions of a lease "should never be interpreted in isolation, but rather in the context of the entire agreement." *Hydra–Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 916 (Minn.1990). When the language of a lease is unambiguous, it should be "given

---

10. Typically, the case-by-case analysis will require the court to look to the lease agreement between the landlord and the tenant. There may also be times, however, when the language of an insurance policy is dispositive of whether a subrogation action may be maintained. If, for example, an insurer has waived its right to subrogation in an insurance policy, a court need look no further than the language of that policy to determine that the insurer cannot maintain a subrogation action against a negligent tenant. Therefore, courts should also look to the language of the insurance policy or policies at issue to determine if the policies themselves resolve the subrogation issue.

its plain and ordinary meaning." *Metro. Airports Comm'n v. Noble,* 763 N.W.2d 639, 645 (Minn.2009); *see also Hydra–Mac, Inc.,* 450 N.W.2d at 916 (explaining that with contracts generally, "the language employed should be given its plain meaning"). And when language is ambiguous, it should be construed against the drafter. *See Hilligoss v. Cargill, Inc.,* 649 N.W.2d 142, 148 (Minn.2002).

In determining the expectations of the parties as articulated in the lease, courts should look for evidence indicating which party agreed to bear the risk of loss for a particular type of damage.[11] Fundamentally, the determination of whether an insurer may bring a subrogation action is circumscribed by the nature of a subrogation action, whereby "there is no right of subrogation unless there is liability in the first instance by the tenant to the landlord." *Rausch,* 882 A.2d at 816. Therefore, if a lease expressly provides that the tenant is not responsible for a particular loss, the landlord could not bring an action against the tenant in the first instance, and there would accordingly be no right of subrogation on the part of the insurer. Moreover, if the lease indicates that the landlord has agreed to procure insurance covering a particular loss, a court "may properly conclude that, notwithstanding a general 'surrender in good condition' or 'liability for negligence' clause in the lease," the landlord and tenant reasonably expected "that the landlord would look only to the policy, and not to the tenant, for compensation for ... loss[es]

covered by the policy." *Id.* In such a case, the insurer would again not be able to maintain a subrogation action, because the landlord would be unable to sue the tenant for the damage under the lease. If, however, a lease obligates a tenant to procure insurance covering a particular type of loss, such a provision will provide evidence that the parties reasonably anticipated that the tenant would be liable for that particular loss, which would allow another insurer who pays the loss to bring a subrogation action against the tenant. *See Am. Family Mut. Ins. Co.,* 757 N.W.2d at 593 (concluding that "subrogation may be appropriate where the lease does not require the landlord to purchase [property] insurance or the lease requires the tenants to purchase their own insurance to cover liabilities resulting from their negligence").

Often a court will be able to determine the expectations of the parties from the language of the lease itself. *See Fire Ins. Exch. v. Hammond,* 83 Cal.App.4th 313, 99 Cal.Rptr.2d 596, 600–02 (2000); *Sahlberg,* 887 P.2d at 1056. But, in addition to the actual language of a lease or insurance policy, courts engaged in a case-by-case analysis may also examine "any other admissible evidence" shedding light on the expectations of the parties. *Rausch,* 882 A.2d at 814. Such evidence could include, among other things, the types of insurance purchased by each party as evidence of each party's expectations with respect to its responsibility for particular losses. *See Am. Family Mut. Ins. Co.,* 757 N.W.2d at 594.

---

11. We have already concluded that the lease in this case placed no express contractual obligation on Rohde to insure against the water damage that occurred. This conclusion, however, is only part of the case-by-case inquiry, and our determination that there was not an express agreement requiring Rohde to procure insurance for the damage that occurred should not be read to preclude the district court from considering the lease provisions we referenced above insofar as the court finds that those provisions are relevant to the expectations of the parties. Likewise, our determination that there is no express agreement does not prevent the district court from determining the expectations of JD Property and Rohde based on other provisions in the lease and on other relevant evidence.

■ Finally, because subrogation is an equitable remedy, in determining whether an insurer may bring a subrogation action in a particular case, courts must weigh "the principles of equity and good conscience." *Dix Mut. Ins. Co. v. LaFramboise*, 149 Ill.2d 314, 173 Ill.Dec. 648, 597 N.E.2d 622, 626 (1992) (explaining that the equities of the case should be considered in addition to examining "the provisions of the lease as a whole [and] the reasonable expectations of the parties"); *Am. Family Mut. Ins. Co.*, 757 N.W.2d at 595 (allowing an insurer to maintain a subrogation action after examining the lease and "[c]onsidering the equitable underpinnings of subrogation"). In balancing the equities, the court may consider, among other factors, whether the lease is a contract of adhesion, and if the provisions allocating responsibility "are found to be unfair," may declare such provisions "invalid as being in violation of public policy." *Rausch*, 882 A.2d at 815; *cf. Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 924–25 (Minn.1982) (explaining that contracts of adhesion, characterized by a disparity of bargaining power between the parties and forced upon an unwilling public for services that cannot readily be obtained elsewhere, will not be enforced). Moreover, the fact that the leased premises are part of a large multi-unit structure may be relevant to the equities and the parties' reasonable expectations regarding responsibility. This factor may be relevant because, in the absence of a "very clear contractual obligation to the contrary," the tenant likely is not "thinking beyond the leased premises" and may not "as a practical matter ... be able to afford, or possibly even obtain, sufficient liability insurance to protect against such an extended loss." *Rausch*, 882 A.2d at 816.

■ In sum, under our case-by-case approach, consistent with the principles outlined above, an insurer will be able to maintain a subrogation action where, based on "the lease as a whole, along with any other relevant and admissible evidence," the district court determines that "it was reasonably anticipated by the landlord and the tenant that the tenant would be liable, in the event of a [tenant-caused property] loss paid by the landlord's insurer, to a subrogation claim by the insurer." *Rausch*, 882 A.2d at 816.

Reversed and remanded for proceedings consistent with this opinion.