*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2132**

Real Time Translation, Inc., d/b/a RTT Mobile Interpretation,
Respondent,

vs.

i.wi, LLC,
Defendant,
Selle Management, Inc., et al.,
Appellants.

**Filed October 5, 2015
Affirmed; motion denied
Stauber, Judge**

Hennepin County District Court
File No. 27CV1221287

Scott A. Johnson, Todd M. Johnson, Hellmuth & Johnson, PLLC, Edina, Minnesota (for respondent)

Christoper P. Parrington, Christopher C. Grecian, Foley & Mansfield, PLLP, Minneapolis, Minnesota (for appellants)

Considered and decided by Peterson, Presiding Judge; Stauber, Judge; and Stoneburner, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**STAUBER**, Judge

Appellants, a former shareholder and the former president and shareholder of respondent business, challenge an adverse judgment in an action for appellants' breaches of nondisclosure and confidentiality provisions of a settlement agreement. Appellants also challenge a permanent injunction that prohibits them from further breaching the settlement agreement and requires them to destroy confidential information belonging to respondent business. We affirm the judgment and deny respondent's motion to strike materials that are outside the appellate record.

## FACTS

Charles Howerton founded respondent Real Time Translation, Inc. (RTT) in 2006 to develop and market a translation device that permits a person wearing the device to receive contemporaneous language translation. First- and second-generation models of the device are hands-free, have "enhanced speaker phone and noise cancellation features[,] and are designed to work through . . . an 'end-to-end operating platform'" that "includes agreements with telephone carriers and interpreting companies, a web-based interface, and a call center through which incoming calls from individuals wearing the devices are routed and instantly connected with the appropriate interpreters."[1] The first-generation model of RTT's device is called the Pro-1 Communicator (Pro-1), and the second-generation model of the device is called the ELSA.

---

[1] Unless otherwise noted, quotations in the facts section are taken from the district court's order granting a permanent injunction.

Appellant Paul Selle is a former shareholder and past president of RTT. Selle provided business consulting services to help start up RTT and in 2007 was hired full time as RTT's president. Selle had no background in the translation business or in the technical aspects of creating a translation device. His duties included "raising money; setting up the new company; helping to obtain a patent for Howerton's concept; getting Howerton's concept engineered, designed and manufactured; and overseeing those who were developing RTT's product, including design engineers, patent attorneys, investor relations, and market researchers."

Selle introduced Howerton to appellant Carlos Jimenez in 2007. Jimenez is experienced in the translation industry, and he became an advisor to RTT, invested $25,000 in the company, and eventually became a minority shareholder. Through his dealings with RTT, Jimenez became familiar with its business plan and functions.

By late 2008, Selle's relationship with Howerton had deteriorated. Selle was discharged as president in late fall of 2008 and was asked to resign from the company in early 2009. His last day of employment at RTT was January 31, 2009, but he remained an RTT shareholder for over a year thereafter. In September 2009, while Selle was still a shareholder, RTT sued him for breach of contract, unjust enrichment, and tortious interference with business relations, alleging that Selle had breached a consulting contract by failing to perform tasks that he had agreed to do to establish RTT's business, overcharged RTT for his services, and made defamatory statements to RTT shareholders. Selle, Jimenez, and another minority shareholder, Anthony C. Muellenberg, asserted counterclaims against RTT that derived from their status as minority shareholders.

At the time of Selle's resignation from RTT, RTT "had design drawings, market research, business plans, investor presentation materials, and marketing videos." RTT asked Selle for all RTT property and proprietary information in his possession at the time of his resignation. Although Selle sent RTT a letter on March 12, 2009, stating that he was returning all of RTT's proprietary information and property, the district court found that he actually "kept copies of almost everything he returned to RTT." Selle kept patented information and emails, as well as "business plans, PowerPoints, [and] investor updates." The district court found that Selle's "secretive behavior" played a part in its decision to find Selle not credible in Selle's later testimony that he was unaware of RTT's work on the ELSA before April 2010.

The district court found that, "[a]t some point in 2009," RTT shifted its product focus to its second-generation device, the ELSA. The ELSA "functions much the same as the Pro-1" but includes an integrated cell phone so that the user can connect directly to a network operating center, identify a translation language, and locate an appropriate interpreter. The ELSA also includes "enhanced speaker phone and noise cancellation technologies."

The parties settled their claims effective April 2, 2010. Under the terms of a settlement agreement, Selle and Jimenez were to be paid $15,000 in exchange for conveyance of their RTT stock shares to the company. The settlement agreement includes the following paragraph, which prohibits appellants from disclosing RTT's proprietary property:

4

a.	*Selle, Muellenberg and Jimenez agree to keep confidential and protect, and agree not to divulge, allow access to or use in any way:*

> i.	*any Intellectual Property Rights, as said term is defined below, of the Company specifically related to proprietary information of certain products and services of the Company (the "proprietary Products"), as defined below;*

> ii.	processes, designs, drawings, samples and inventions, past, current and planned research and development, current and planned manufacturing and distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, improvements, devices, know-how, discoveries, concepts and methods related to the Proprietary Products;

> iii.	any and all information concerning the business and affairs of RTT . . . , however documented; and

> iv.	any and all notes, analyses, compilations, studies, summaries and other material containing or based, in whole or in part, on any information included in the foregoing of RTT (collectively, the "Confidential Information").

> Selle, Muellenberg and Jimenez acknowledge that such Confidential Information constitutes a unique and valuable asset of RTT and represents a substantial investment of time and expense by RTT, and that any disclosure or other use of such Confidential Information other than for the sole benefit of RTT would be wrongful and would cause irreparable harm to RTT.  Selle, Muellenberg and Jimenez agree to return all tangible and intangible embodiments (and all copies) of such Confidential Information that are in their possession and to destroy all intangible embodiments (and all copies) of such Confidential Information that are in their possession.

b.      For purposes of this Agreement, "Intellectual Property Rights" means RTT's:

      i.      rights in patents, patent applications and patentable subject matter, whether or not the subject of an application, of the Proprietary Products;

      ii.      rights in trademarks, service marks, trade names, trade dress and other designators of origin, registered or unregistered of the Proprietary Products;

      iii.      rights in copyrightable subject matter or protectable designs, registered or unregistered of the Proprietary Products;

      iv.      trade secrets related to the Proprietary Products;

      v.      rights in internet domain names, uniform resource locators and e-mail addresses;

      vi.      know-how related to the Proprietary Products; and

      vii.      all other intellectual and industrial property rights of every kind and nature and however designated, whether arising by operation of law, contract, license or otherwise, involving the Proprietary Products.

c.      *For purposes of this Settlement Agreement, "Proprietary Products" shall mean RTT's mobile interpretation device, services and end-to-end operating platform.*

d.      Selle, Muellenberg and Jimenez acknowledge that RTT has required that Selle, Muellenberg and Jimenez make the agreements in this [P]aragraph . . . as a condition of RTT's entry into this Agreement. Selle, Muellenberg and Jimenez agree that the agreements contained in this [p]aragraph . . . are reasonable and necessary to protect the legitimate interests of RTT and that any violation or breach of this [p]aragraph . . . will result in irreparable injury to RTT for which no adequate remedy would exist at law.

Accordingly, in addition to any relief at law that may be available to RTT for such violation or breach and regardless of any other provision contained in this Agreement, RTT will be entitled to injunctive and other equitable relief restraining such violation or breach.

. . . .

f.     Jimenez, Muellenberg and Selle represent, warrant and covenant that to the best of their knowledge they, collectively and in their individual capacity, have not knowingly or intentionally, as of the date of the full execution of this Settlement Agreement, disclosed any of RTT's Confidential Information as said term is defined herein except to legal counsel and accounting professionals. . . .

(Emphases added.)  The settlement agreement also includes a provision that requires the parties to "refrain from publishing, disseminating or communicating to any third parties disparaging comments about the other, or about any director, officer, employee or agent of the parties."  The settlement agreement further provides for an award of attorney fees to the prevailing party for breach of the agreement.

In late 2011, RTT learned that another company, i.wi, LLC (i.wi),[2] was in the process of developing a product nearly identical to RTT's and that i.wi's business plan copied a large portion of RTT's business plan.  Selle, Jimenez, and Muellenberg are the founders of i.wi, and Selle is the majority shareholder.  Upon learning this, RTT brought a breach-of-contract action against Jimenez, Muellenberg, Selle, and Selle's management

---

[2] In a posttrial order, the district court denied RTT's motion to amend the complaint to add Instant Wireless Interpretation, LLC (IWI) as a defendant.  The district court denied the motion, but the district court and the parties commonly refer to i.wi as IWI throughout these proceedings.

7

company.[3] The only remedy RTT sought for breach of the settlement agreement was the issuance of a permanent injunction against appellants, and attorney fees. The parties stipulated before trial that the settlement agreement is unambiguous and fully integrated. Muellenberg settled with RTT in 2013.

Following a bench trial at which the district court received lengthy testimonial and a significant amount of documentary evidence concerning the parties' roles and conduct with regard to RTT's and i.wi's businesses, the district court ruled that appellants had violated the settlement agreement. The district court concluded that Selle and Jimenez breached both their obligations of confidentiality and nondisclosure, stating:

> They breached the Agreement when they retained confidential RTT documents on their computers after such documents were supposed to have been returned or destroyed. They breached the Agreement when they made use of some of those documents in their efforts to set up a competing business after April 2, 2010. They breached the Agreement when they used confidential and proprietary information learned through their association with RTT to create a functionally identical device to market and sell through IWI, including virtually identical marketing videos.

The district court permanently enjoined Selle and Jimenez from committing any further breaches of the settlement agreement, ordered them to return or destroy all confidential information held by them, prohibited them from further use of proprietary information, and ruled that RTT was the prevailing party for purposes of an attorney fees award.

---

[3] The complaint also included a deceptive trade practices claim that was later dismissed by stipulation.

8

The district court denied appellants' motion for a new trial and awarded RTT attorney fees of $280,000, reduced from its claimed amount in excess of $425,000. This appeal followed.

## D E C I S I O N

The primary issue in this appeal is whether the district court erred in its interpretation of the parties' settlement agreement. "[T]he goal of contract interpretation is to ascertain and enforce the intent of the parties." *RAM Mut. Ins. Co. v. Rohde*, 820 N.W.2d 1, 14 (Minn. 2012) (quotation omitted).

> This court reviews the district court's interpretation of a contract as a question of law subject to de novo review. A clear and unambiguous contract is enforced in accordance with the plain language of the contract; a reviewing court considers parol evidence or matters outside of the contract only when the contract terms are ambiguous.

*Terminal Transp., Inc. v. Minnesota Ins. Guar. Ass'n*, 862 N.W.2d 487, 489 (Minn. App. 2015) (citation omitted). The principles of contract law dictate that, if contract language is subject to only one reasonable interpretation, that interpretation must apply. *Seagate Tech., LLC v. W. Dig. Corp.*, 854 N.W.2d 750, 761 (Minn. 2014). Further, a reviewing court must read the terms of a contract in the context of the whole agreement, giving effect to all of its terms. *Kalenburg v. Klein*, 847 N.W.2d 34, 40 (Minn. App. 2014).

The parties claim that the settlement agreement is unambiguous, and yet they each urge a different reading of the agreement to determine whether the agreement applies to the second-generation ELSA product. Respondent asserts that particular nondisclosure provisions, as well as the broad language of the agreement overall, dictate that the ELSA

9

should be included in the definition of proprietary property protected by the settlement agreement. Appellants assert that the singular form of the word "device" in the definition of "proprietary products" references only the Pro-1 product, and that the ELSA should not be included in the agreement.

Appellants' argument depends on the meaning given to the definition of RTT's proprietary products. The relevant provision states that "[f]or purposes of this Settlement Agreement, 'Proprietary Products' shall mean RTT's mobile interpretation device, services and end-to-end operating platform." Appellants assert that the district court erred by finding that "RTT's mobile interpretation device" includes both the Pro-1 and the ELSA because this interpretation does not give effect to the singular form of the word "device." They also argue that, consistent with the testimony of Selle, Howerton, and David Ladner (RTT's CEO after Selle left the company), the use of "device" in the settlement agreement could refer only to the Pro-1 because the ELSA was not officially released until 15 months after Selle's departure from RTT.

While appellants 'urged interpretation of "device" seems reasonable in a grammatical sense and when read in isolation, it does not comport with many other specific provisions of the settlement agreement and contradicts the overall broad language and spirit of the settlement agreement. Further, other provisions of the settlement agreement refer to "devices" rather than "device," and the agreement is replete with references to "proprietary products," which is contrary to appellants' argument that RTT made only one "product" at the time that Selle and RTT entered into the settlement agreement. The word "device" can only be reasonably interpreted to represent both the

Pro-1 and the ELSA models—the ELSA "device" is an enhanced version of the Pro-1 "device."

This interpretation is consistent with other provisions that provide very broad protection for RTT's property, including, for example, nondisclosure provisions that apply to "past, current and planned research and development," and "concepts and methods related to the Proprietary Products." Numerous other provisions such as these would have no effect if the ELSA was not included within the definition of proprietary products. When read as a whole, the settlement agreement unambiguously supports the district court's interpretation of "device" to include the ELSA as well as the Pro-1. *See Seagate Tech., LLC*, 854 N.W.2d at 761 (requiring contract to be given a particular interpretation, if only that interpretation is reasonable); *Kalenburg*, 847 N.W.2d at 40 (requiring contract to be interpreted in the context of the whole agreement, giving effect to all of its terms).

The district court's numerous and detailed factual findings, which are not challenged by appellants, also clearly establish that Selle was aware of the development of the ELSA long before he left RTT. Selle's final break from the company did not occur until 2010, but RTT's production focus shifted to the ELSA in 2009. Appellants also downloaded and retained hundreds of pages of RTT documents and other information pertaining to every facet of RTT's business; forwarded some of those documents to others who joined Selle in establishing i.wi; used ideas, frameworks, concepts, and sometimes identical language or video recordings in contacts with other entities, including vendors and investors; and even claimed to potential investors that i.wi

11

"acquired the value of RTT's intellectual property" by "capitaliz[ing] on their knowledge of RTT's proprietary information as an asset of IWI." These actions demonstrate clear violations of the settlement agreement.

Because the settlement is not ambiguous, the district court did not err by denying appellants' new-trial motion to permit the parties to offer evidence of their intent regarding the settlement agreement. The only procedural ground for granting the motion would be for "[e]rrors of law occurring at trial." Minn. R. Civ. P. 59.01(f). The district court did not err by upholding appellants' stipulation that the contract was the sole evidence to be used by the court to interpret the contract. *See Lichterman v. Laundry & Dry Cleaning Drivers Union, Local No. 131*, 204 Minn. 75, 79, 283 N.W. 752, 752 (1939) (rejecting petition for rehearing in labor dispute and enforcing stipulation that case did not present a constitutional issue, stating that the "stipulation is controlling, and so narrows the issue that no constitutional question was presented"); *Warren v. Great N. Ry.*, 64 Minn. 239, 241, 66 N.W. 984, 986 (1896) (stating that when railway stipulated to damages from accident and evidence at trial did not support stipulated amount, "[d]efendant is not in a position to assail its own stipulation, and the order appealed from must be affirmed").

Finally, respondent moved to strike portions of appellants' principal brief as pertaining to matters outside the record on appeal. *See* Minn. R. Civ. App. P. 110.01 ("The documents filed in the trial court, the exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases."). Because we did not consider or rely on the challenged materials in reaching our decision, we deny the

12

motion as moot.  *See Drewitz v. Motorwerks, Inc.*, 728 N.W.2d 231, 233 n.2 (Minn.

2007) (denying motion to strike as moot when court did not rely on challenged

materials).

**Affirmed; motion denied**.